Ballard **BOATSON**, Defendant Below, Appellant,

v.

**STATE of Delaware**, Plaintiff Below, Appellee.

Supreme Court of Delaware.

Submitted: Oct. 15, 1982.

Decided: Feb. 7, 1983.

Edward C. Pankowski, Jr. (argued), Asst. Public Defender, Wilmington, for defendant below, appellant.

John A. Parkins, Jr. (argued) and Robert H. Richter, Deputy Attys. Gen., Wilmington, for plaintiff below, appellee.

Before HERRMANN, C.J., McNEILLY and QUILLEN, JJ.

HERRMANN, Chief Justice:

The defendant seeks reversal of his conviction for Murder in the First Degree [11 *Del.C.* § 636(a)(1) ][1] on the grounds that the Trial Court committed reversible error (1) in refusing to grant a mistrial after the State, in its opening statement, referred to the bifurcated nature of the trial, and the Court commented thereon; (2) in refusing to grant a mistrial after the State, during its summation, inaccurately recounted a statement by the defendant; and (3) in giving the jury a coercive supplemental charge.

### I.

The defendant, Ballard Boatson, was charged with the murder of Gilbert Nichols. At trial before a jury, the State's evidence

---

1. 11 *Del.C.* § 636 provides in pertinent part:

"§ 636. Murder in the first degree; class A felony.

"(a) A person is guilty of murder in the first degree when:

"(1) He intentionally causes the death of another person;

\* \* \*

"(b) Murder in the first degree is a class A felony and shall be punished as provided in § 4209 of this title."

established the following facts: At approximately 4:00 p.m. on June 10, 1981, the defendant was released from a detoxification center where he had spent the previous night. After making several stops, he returned to his Wilmington residence at approximately 6:00 p.m. Sylvester Johnson, another resident of the house and an eyewitness to the crime later committed, was present at the house when the defendant arrived. The defendant left shortly thereafter to purchase, and later consume, one half pint of whiskey and a six-pack of beer.[2]

Shortly before 11:00 p.m., the defendant approached three of his neighbors, asking each of them for a steel pipe. He told two of them that he wanted the pipe to kill Nichols. He told the third that he wanted to kill the victim because Nichols was criticizing the defendant's mother. All three refused his request.

Shortly thereafter, Johnson was in the front living room area of the house when the defendant entered with a steel pipe. The victim, another resident of the house, was asleep in his bed in the adjacent dining room area. The defendant entered the victim's room and struck him twice with the pipe while he slept. Cause of death was established as severe cerebral and cranial injuries caused by the pipe. The defendant subsequently swung at Johnson with the pipe, stating "You're next." Johnson deflected the pipe with a crow bar, in the process hitting the defendant in the head.

The defendant then went out to the sidewalk and broke out windows of the house.

The jury found the defendant guilty as charged. He was sentenced to life imprisonment without probation or parole.

We discuss *seriatim* the grounds of appeal, supplying additional facts as necessary. We affirm.

## II.

In the State's opening statement, the prosecutor referred to the bifurcated nature of the trial as provided in 11 *Del.C.* § 4209.[3] In substance, he informed the jury that if it found the defendant guilty of Murder in the First Degree, a second hearing would be held to determine the appropriate penalty. The defendant requested a mistrial on the ground that the State's reference to the penalty phase would prompt jurors to return a verdict of guilty, with the understanding that they could later "adjust" the verdict by imposing a lenient sentence. The Court denied the request, finding that the comments followed settled Delaware law and practice, and that no prejudice resulted therefrom.

The defendant contends that the references by the prosecutor and the Court to the § 4209 bifurcated trial procedure resulted in the jury's improper consideration of issues not related to the defendant's guilt or innocence, in violation of the rule of

---

**2.** At the conclusion of the State's case, the defendant presented a motion for judgment of acquittal of the charge of Murder in the First Degree. His level of intoxication at the time of the crime, he argued, prevented him from forming the requisite intent to support the charge. He concluded that the charge should be reduced to Murder in the Second Degree [11 *Del.C.* § 635(1)]. The Court denied the motion and the defendant does not appeal such denial.

**3.** 11 *Del.C.* § 4209 provides in pertinent part:
"§ 4209. Punishment, procedure for determining punishment, review of punishment and method of punishment for first-degree murder.
"(a) *Punishment for first-degree murder.* —Any person who is convicted of first-degree murder shall be punished by death or by im-

prisonment for the remainder of his or her natural life without benefit of probation or parole or any other reduction, said penalty to be determined in accordance with this section.
"(b) *Separate hearing on issue of punishment for first-degree murder.*—
"Upon a conviction of guilt of a defendant of first-degree murder, the Superior Court shall conduct a separate hearing to determine whether the defendant should be sentenced to death or to life imprisonment without benefit of probation or parole as authorized by subsection (a) of this section. If the defendant was convicted of first-degree murder by a jury, this hearing shall be conducted by the trial judge before that jury as soon as practicable after the return of the verdict of guilty. * * *."

*Smith v. State,* Del.Supr., 317 A.2d 20 (1974), and, therefore, vitiated the verdict. We disagree.

In *Smith, supra,* this Court held that, where appropriate, it should be made clear to the jury that it is not within the scope of its duty to consider and attempt to evaluate the possibility of post-conviction remedies, i.e., pardon, parole or probation. 317 A.2d at 25–26; *accord, Hand v. State,* Del.Supr., 354 A.2d 140 (1976) (possible disposition of defendant as result of insanity finding not to be considered by jury). The *Smith* rationale is two-fold: first, knowledge on the part of the jury that governmental authorities may review the case may cause the jury to avoid its responsibility and compromise on the question of guilt; second, a jury relying on the possibility of what it considers to be post-conviction clemency may compensate by dealing with the case more severely. 317 A.2d at 25–26.

Although *Smith* involved references to possible post-conviction remedies while we are concerned here with drawing the jury's attention to the penalty phase of a first-degree murder trial, the *Smith* rationale and rule is apposite here. The State argues that neither the prosecutor's nor the Court's remarks were improper or prejudicial because the jury had been informed, at the array, of the possibility of a penalty hearing. But this is not an adequate response.

In our statutory bifurcated capital case procedure, in sharp contradistinction to noncapital cases, the jury's knowledge of its involvement in the possible penalty is an inherently necessary, although narrowly circumscribed, circumstance. *See, e.g., Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); 11 *Del.C.* § 3301; *Hooks v. State,* Del.Supr., 416 A.2d 189 (1980).

■ Because the concerns of this Court in *Smith,* i.e., possible jury speculation and verdict "adjustment," are of special significance in a first-degree murder case in which the possible penalties are death or mandatory life imprisonment without probation or parole, it is important that the jury's atten-tion not be unduly focused on the penalty stage before or during the guilt/innocence phase. Improper focus upon the penalty hearing during the array, in the opening statement, and later by the Court could constitute undue and prejudicial focus. As this Court stated in *Smith, supra:*

"When confronted with [a question from the jury not related to the determination of innocence or guilt], the Court should instruct the jury that its duty is to decide guilt or innocence only . . .; in no circumstance should the jury concern itself with what may occur after verdict."

317 A.2d at 26. In the instant case, the Trial Court instructed the jury that:

" . . . [T]here will be a separate hearing, after which you will be instructed on the applicable considerations and will be called upon to render a verdict of recommendation concerning punishment. *However, you should render your verdict at this stage on the issue of guilt or innocence of the defendant of any of the charges based on your finding of the facts and applying the elements required for the crime and not upon consideration of possible punishment."* (Emphasis supplied).

Clearly, the Court fulfilled the affirmative duty imposed by *Smith.* The prosecutor, in his opening, stated the following:

"And the first part of this trial, as you heard when you were being selected for jury duty, involves your determining basically one question. Did the defendant commit murder in the first degree? If your answer to that question is, 'Yes,' there will be a second proceeding which will involve penalty. *But that's not in front of you right now. All you are going to be asked to do at first is to listen to all of the evidence and decide if the defendant is guilty of murder in the first degree."* (Emphasis supplied)

Thus, the prosecutor himself included the admonition required by *Smith.*

In sum, the *Smith* standard was not violated here.

### III.

At trial, a police detective testified that when he arrived at the crime scene, he heard the defendant say, "I hit him with the pipe. I hope he dies. If I spend fifty years in jail, it's okay. I don't care." The prosecutor, in his summation, recounted the defendant's statement to the jury as follows: "He is essentially in the street screaming, 'I killed a man. If he ain't dead, get me another pipe. I don't care if I spend fifty years in jail.'" The defendant requested a mistrial on the ground that the prosecutor improperly introduced prejudicial statements that were neither in evidence nor ever made by the defendant. The Court denied the motion; instead, it immediately instructed the jury that it should disregard the comment.[4]

As to the defendant's contention that the Trial Court abused its discretion in *refusing* to declare a mistrial: The defendant relies upon *McCarthy v. State,* Del.Supr., 372 A.2d 180 (1977), wherein this Court held that in order to secure a reversal based on an opening statement of the prosecutor, the accused is required to establish either bad faith on the part of the prosecutor or actual prejudice to the defendant's case. *Id.* at 185. According to the defendant, the prosecutor's statement manifested bad faith and resulted in actual prejudice to the defendant.

When questioned by the Court regarding the accuracy of his comments, the prosecutor responded:

"I can't really honestly discount the possibility that it wasn't something that was said at the suppression hearing or perhaps not said at all. All I can say is that [the detective] and I both thought that this is what [the detective] had said when he had testified towards the very beginning of the trial."

The defendant asserts that the response manifested a reckless disregard for accuracy tantamount to bad faith.

Actual prejudice, the defendant contends, resulted from the misstatement because the prosecutor's version tended to establish the gravamen of the offense charged, i.e., the intent to commit Murder in the First Degree, while the statement as originally recounted at trial by the detective did not establish the requisite intent. The detective's version, the defendant maintains, suggests that the defendant did not at the time of striking the victim intend that his blows be fatal; it was not until *after* striking the victim that the defendant formed the hope that the victim would die.

We find these contentions to be without merit. A prosecutor is allowed and expected to explain all the legitimate inferences of the defendant's guilt that follow from the evidence. *Hooks v. State,* Del. Supr., 416 A.2d 189, 204 (1980). We are convinced from our examination of the record—and, more particularly, of the detective's version of the statement—that the prosecutor's comments in the instant case reflected legitimate inferences from the evidence, i.e., that the defendant intentionally killed the victim. We do not find bad faith.

We are concerned, however, with the apparent carelessness with which the prosecutor fashioned his comments. As this Court emphasized in *Hooks, supra:*

"If there is a growing tendency toward carelessness on the part of counsel, whether caused by inexperience, excessive zeal or otherwise, it should be discouraged and not condoned by inaction." 416 A.2d at 204. We recognize the difficulty of achieving letter-perfect recollection of trial testimony when counsel usually must proceed on the basis of trial notes rather

---

4. The Trial Judge instructed the jury, in pertinent part:

"Now, the only determination, as far as your verdict is concerned as to what the defendant may have said at that time, is your recollection of what the witnesses testified to when they testified on the witness stand. *You may completely disregard what the attorneys may say was said.* It's your recollection of what you heard the witnesses say which controls, and that's the only thing you should consider in connection with your verdict." (Emphasis supplied)

than a transcript. Further, we note with approval that the prosecutor in this case did attempt to confirm his recollection by conferring before the summation with the police detective. With all of that said, however, we may not disregard the prosecutor's admission that the statement he recounted to the jury was "perhaps not said at all." Although we do not agree that the prosecutor's action in this case rose to the level of misconduct indicating bad faith, it requires repetition of the *Hooks* admonition above quoted.

■ An improper prosecutorial remark, however, requires reversal when it prejudicially affects substantial rights of the accused. *Sexton v. State,* Del.Supr., 397 A.2d 540, 544 (1979). To determine whether the remarks in the instant case so affected the defendant, we look to the three-prong test adopted by this Court in *Hughes v. State,* Del.Supr., 437 A.2d 559 (1981), namely: (1) the centrality of the issue affected by the alleged error; (2) the closeness of the case; and (3) the steps taken to mitigate the effects of the alleged error. *Id.* at 571.

■ Applying the test to the instant case: The defendant's intent at the time of the crime and his commission of the act were clearly issues central—indeed indispensable—to the State's case. The case, however, was not close: two witnesses testified that the defendant told them he intended to kill the victim; and the victim's housemate testified as an eyewitness to the commission of the crime. Moreover, the Trial Judge's immediate and thorough instruction to the jury that it could disregard the statement mitigated the effects of the comments. *Edwards v. State,* Del.Supr., 320 A.2d 701, 703 (1974).

We hold that the prosecutor's remarks, although improper, did not deprive the defendant of a fair trial. *Compare Hughes,* 437 A.2d at 566–73.

## IV.

The jury deliberated for approximately nine hours over two days before sending to the Trial Judge the following note: "Positively hung. Could not reach a verdict." The Court, at the State's request and over the defendant's objection, gave the jury a modified *Allen* "dynamite" charge.[5] Approximately one-half hour later, the jury sent the Court another note asking whether it could recommend a sentence if it found the defendant guilty, and, if so, whether the recommendation would be followed. In response, the Court told the jury that, if it found the defendant guilty of Murder in the First Degree, it would be called upon, in a separate hearing, to render a "verdict of recommendation" regarding punishment. After an additional five hours of deliberations, the jury found the defendant guilty as charged.

The defendant contends that the charge was coercive as a matter of law under the standard announced by this Court in *Streitfeld v. State,* Del.Supr., 369 A.2d 674 (1977). In *Streitfeld,* this Court held that the defendant was not prejudiced by a supplementary instruction, emphasizing (i) the time of day when the instruction was given, (ii) the words used, (iii) the length of the deliberations both before and after the instruction, and (iv) the complexity of the case. *Id.* at 677.

■ Applying the *Streitfeld* standards to the instant case:

(1) The defendant argues that at the time the Court gave the jury the charge, 2:30 p.m., the jury was tired and therefore "more susceptible to pressure." We find no support in the record for this contention.

(2) The defendant asserts that the words of the charge were coercive, resulting in a

5. A so-called "*Allen* charge" or "dynamite charge" is a supplementary instruction that encourages a jury to reach a verdict following the announcement of a deadlock. *Allen v. United States,* 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Such a charge is grounded upon the desire to avoid the time and expense of relitigation, *id.,* and is generally proper so long as the jurors are warned not to abandon their personal convictions. *Brown v. State,* Del.Supr., 369 A.2d 682, 684 (1976).

compromise verdict in violation of *Hyman Reiver and Company v. Rose,* Del.Supr., 147 A.2d 500 (1958) and *Brown v. State,* Del. Supr., 369 A.2d 682 (1976). In *Reiver, supra,* this Court held that the total effect of the supplemental charge must be considered to determine whether the Trial Court unduly influenced the jury in reaching a verdict. 147 A.2d at 506. *Brown* requires that "the [*Allen*] charge include an admonition that each individual juror not surrender his or her honest convictions and not to return any verdict contrary to the dictates of personal conscience." 369 A.2d at 684.

The defendant contends that, notwithstanding *Brown* admonitions, the Trial Judge's reference to the jurors' "duty to consult with one another" and "duty to agree upon a verdict" abrogated the beyond-a-reasonable-doubt standard mandated for criminal trials and resulted in a compromise verdict. We disagree.

While the jurors were advised that it was their "duty" to consult and reach a verdict, each reference to such was accompanied by a "personal conscience" admonition. Indeed, an examination of the record reveals that the Trial Judge so admonished the jury five times in the charge.[6] Consequently, the wording of the charge was not coercive.

(3) The defendant contends that because the jury deliberated for nine hours before indicating deadlock and, a short time after the *Allen* charge, asked the Trial Judge whether it could recommend the punishment, a compromise verdict followed five additional hours of deliberation. We find this position wholly untenable in light of the repeated admonitions by the Trial Judge.

(4) Finally, the defendant argues that the complexity of the instant case confused certain jurors and made them susceptible to coercion. The record does not support this contention.

We hold that the charge was not coercive as a matter of law. The Trial Judge did not abuse his discretion.

\*   \*   \*   \*   \*   \*

Affirmed.

---

**6.** Noteworthy is the conclusion of the charge, wherein the Court stated in pertinent part:

"*Remember, at all times, no juror is expected to yield his or her conscientious conviction which he may have as to the weight and effect of the evidence;* and remember also, that after the full deliberation and consideration of all the evidence, it is your duty to agree upon a verdict, *if you can do so without violating your individual judgment and conscience.*" (Emphasis supplied).