John BROKENBROUGH, Appellant,
Defendant Below,

v.

STATE of Delaware, Appellee,
Plaintiff Below

Supreme Court of Delaware.

Submitted: Jan. 20, 1987.
Decided: March 18, 1987.

Lawrence A. Ramunno, Wilmington, for appellant-defendant below.

M. Jane Brady (argued), Deputy Atty. Gen., Dover, for appellee, plaintiff-below, Eugene M. Hall, State Prosecutor, Wilmington.

Before MOORE, WALSH and HOLLAND, JJ.

PER CURIAM:

John Brokenbrough was tried before a jury and convicted for Delivery of Cocaine, in the Superior Court, in and for Kent County. A co-defendant, George Atkins, was tried and convicted at the same trial for Delivery of Cocaine and Second Degree Conspiracy. John Brokenbrough was sentenced to be imprisoned for eight years. In this appeal, Brokenbrough sets forth two grounds which he contends require reversal of his conviction. First, he asserts that

there was insufficient evidence to support the jury's verdict. Second, he alleges that improper and prejudicial closing argument to the jury by the prosecutor denied him a fair and impartial trial. An understanding of the factual circumstances is important for an analysis of both of the issues that Brokenbrough raises in this appeal.

On March 5, 1986, Detective Bullen, an undercover Delaware State Police officer, met with the co-defendant, Atkins, for the purpose of purchasing a quantity of cocaine. Bullen and Atkins drove to an apartment complex in Dover, Delaware. They both entered the apartment of Mary Scott, who resided in the complex. Inside the Scott apartment, Detective Bullen asked Mary Scott about the possibility of purchasing drugs. At the time, Detective Bullen was wearing a "body microphone" which taped the conversation. Following a brief discussion, Mary Scott left her apartment to procure some drugs. During Scott's absence, the co-defendant, George Atkins, told Detective Bullen that Scott was "only going three doors down." Scott returned to the apartment shortly after leaving and told Bullen that she could not obtain any cocaine at that time but that she could obtain some at about 3:30 p.m. later that day.

Detective Bullen and Atkins left the Scott residence. Atkins stated that he had to go to work but he assured both Scott and Bullen that they could trust each other. Detective Bullen returned to the Scott residence alone at approximately 3:30 p.m. where he met with Scott. Once again, Scott left her apartment after telling Detective Bullen to wait there. She returned promptly with a substance that was subsequently tested and proved to be cocaine. Detective Bullen paid Scott $1,040.00 for the drug and left the Scott apartment.

Scott was arrested later that same evening. Following her arrest, Scott gave a statement to the police indicating that she had obtained the cocaine which she had sold to Detective Bullen from Brokenbrough, the defendant. Prior to receiving the cocaine from Scott, Detective Bullen did not see, hear, or talk to Brokenbrough.

Bullen did testify, however, that on his second visit to the Scott residence, he observed a green van which he believed was the same type of van that Brokenbrough drove and which was registered to Brokenbrough. Detective Bullen further testified that he did not believe that the van was present during his first visit to the Scott apartment.

Scott testified that she lived in the apartment complex where she had met with Detective Bullen. Scott further testified that although Brokenbrough lived three doors from her apartment, she knew very little about him. Scott testified that when she left her apartment after the first meeting with Bullen, she went to see Brokenbrough and asked him if she could obtain one ounce of cocaine. According to Scott, Brokenbrough told her that she could only purchase one-half ounce of cocaine and that the cost would be $1,050.00. During the initial conversation with Brokenbrough, Scott and Brokenbrough agreed that the cocaine would be available for her to purchase later in the day at approximately 3:30 p.m. Scott testified that she ultimately obtained the cocaine from Brokenbrough in the parking lot of the apartment complex. She stated that the purchase was completed next to Brokenbrough's green vehicle.

The record reflects that Scott was originally charged with the offenses of Delivery of Cocaine, Second Degree Conspiracy, and Maintaining a Dwelling. Pursuant to a plea agreement, the original charges against Scott were modified and she agreed to testify against Brokenbrough. During the trial, Scott admitted that she had a prior drug record which would have resulted in mandatory incarceration, if she had been convicted of the original charges.

Brokenbrough testified on his own behalf at trial and presented two alibi witnesses, Ernest Sutler and Jackie Tilgman. Tilgman testified that Brokenbrough was working at several jobs at or about the time of the alleged offense. Tilgman further testified that Brokenbrough played cards "just about every Monday night" including the evening prior to the offense. Tilgman testified that it was not unusual

for Brokenbrough to come home at 3:00 or 4:00 a.m. as he did on March 5, 1985. Tilgman stated that she could remember nothing unusual or out of the ordinary that occurred on March 5, 1985.

Mr. Sutler testified that he and Brokenbrough both worked for the same employer. Sutler stated that on March 5, 1985, he and Brokenbrough, in the course of their employment, left Dover between 8:30 and 9:30 a.m. to pick up a vacuum cleaner at the home of a Mrs. Nora Sabbagh, who lived in Wilmington near Route 202. Sutler testified that he and Brokenbrough picked up the vacuum cleaner from Mrs. Sabbagh on March 5, 1985, made several other stops, had lunch and returned to Dover at approximately 4:30 p.m. Sutler testified that he had made out a receipt for Mrs. Sabbagh. The original receipt was not available at trial but a copy of the Sabbagh receipt was admitted into evidence.

Brokenbrough testified that he was working in Wilmington on March 5, 1985, with Ernest Sutler. He also testified that he and Sutler went to a residence in North Wilmington, near 202. However, contrary to Sutler's testimony that they went to pick up a vacuum cleaner, Brokenbrough testified that he and Sutler delivered a vacuum cleaner to the Sabbagh residence. Brokenbrough stated that he and Sutler returned to Dover at approximately 4:30 p.m. or 5:00 p.m. on March 5, 1985. During the course of Brokenbrough's testimony, he originally denied owning the green van that had been identified by Detective Bullen. However, during cross-examination, after being shown a Division of Motor Vehicle document evidencing his ownership of the van, Brokenbrough testified that "the vehicle was owned in 1982 when I was busted in Middletown for drugs. I had the vehicle all along." Brokenbrough also admitted during cross-examination that he had been convicted of a felony on two prior occasions.

Sabbagh was called by the State as a rebuttal witness. She testified that she did own a vacuum cleaner that had been serviced by a Dover company. However, she testified that the vacuum cleaner had been

serviced some time in December, 1984 or January 1985, although she was inclined to believe that it had been serviced before Christmas. She further testified that she had left her residence near Wilmington on January 22, 1985 for Bangladesh, Pakistan. Sabbagh testified that she returned to her residence from Pakistan on approximately March 19, 1985. Sabbagh testified that when the vacuum cleaner was returned to her, it was returned by one man, not two. She also stated that the man who returned the vacuum cleaner was aware of the fact that she lived overseas. Finally, she testified that the March 5, 1985, date on the copy of the receipt that was introduced into evidence, could not be the date that the vacuum cleaner had been picked up or dropped off at her home.

I

Brokenbrough's first argument is that there was insufficient evidence to support the jury's verdict. In particular, Brokenbrough states that his conviction was based solely upon the uncorroborated testimony of the co-defendant, Scott. At common law, the uncorroborated testimony of an accomplice was sufficient to warrant a conviction, if it satisfied the trier of fact beyond a reasonable doubt. Brokenbrough admits that this common law rule is still the majority rule and is the rule of law in Delaware. However, Brokenbrough urges this Court to reject our present rule and require corroboration of accomplice testimony.

This Court has consistently held that corroboration of accomplice testimony is not required or necessary. Some time ago, we held that "this rule has been followed repeatedly for many years and we consider it too deeply embedded in the law of the State to permit our changing it by judicial action. We accordingly decline to reverse the holding in *O'Neal v. State* [Del., 247 A.2d 207]." *Bland v. State*, Del.Supr., 263 A.2d 286, 288 (1970). We reaffirmed that position in *Wintjen v. State*, Del.Supr., 398 A.2d 780 at 781 (1979). In *Wintjen*, we stated:

"The law in Delaware is settled on this point and it is contrary to what *Wintjen*

argues. Briefly stated, corroboration of accomplice testimony is not required, absent extraordinary circumstances. *Bland v. State,* Del.Supr., 263 A.2d 286 (1970); *Jacobs v. State,* Del.Supr., 358 A.2d 725 (1976). In this case there is no 'irreconcilable conflict' in the testimony of defendant's alleged accomplices which might otherwise warrant removal of the case from consideration by the jury. *Bland, supra.,* 263 A.2d at 288. Rather the testimony of the accomplices is substantially consistent. Its credibility was a matter for the jury to weigh. Wintjen's first argument is without merit." *Id.* at 781 (Footnote omitted).

■ Brokenbrough correctly points out that although accomplice testimony need not be corroborated, it does not preclude a court from granting a judgment of acquittal when there is an irreconcilable conflict in the State's case concerning the defendant's guilt. In fact, *Bland* was such a case. Brokenbrough argues that his motion for a judgment of acquittal should have been granted for similar reasons. Our review of the record leads to the conclusion that the State's case was internally consistent and that the only conflict which appeared is revealed in Brokenbrough's defense.

■ The State's case was straightforward. Detective Bullen testified that he did not see Brokenbrough's van on his first visit to Scott's apartment when the cocaine was unavailable but did observe Brokenbrough's van on his second visit to Scott's apartment when the cocaine was purchased. Despite the fact that Scott had not reviewed a statement that she had given to the police on the day of her arrest, her trial testimony was basically consistent with that prior statement. Atkins stated that Scott was going to obtain the cocaine at an apartment which was located three doors from her own. Scott testified that Brokenbrough lived in an apartment which was located within three doors of her own.

Brokenbrough presented an alibi defense. This defense denied the veracity of Scott's testimony concerning his involvement in the crime and made his credibility a

central issue. Having placed his credibility in issue, Brokenbrough first denied owning a vehicle which he subsequently admitted operating during a "drug bust" and which he "had all along." Defendants must testify truthfully or suffer the consequences. *United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980). Brokenbrough and his alibi witness, Ernest Sutler, contradicted each other about whether they were picking up or dropping off a vacuum cleaner. Finally, Sabbagh, the woman to whom Sutler stated he gave a receipt and from whom he stated he received a vacuum cleaner on March 5, 1985, testified that she was in Bangladesh, Pakistan on that date. Sabbagh further testified that her vacuum cleaner had been serviced months earlier and that the "one man" who returned the vacuum cleaner to her home, knew that she lived outside of this country. Brokenbrough's alibi defense was, therefore, directly contradicted by Sabbagh, a disinterested third party.

We find no irreconcilable conflict in the State's case concerning Brokenbrough's guilt which, under *Bland,* would have required the Superior Court to remove his case from the jury. The record reflects that the only irreconcilable conflicts were in the defendant's case and leaves no doubt as to why those conflicts were resolved by a rejection of Brokenbrough's alibi defense. Our review of the record leads to the conclusion that the evidence against Brokenbrough was strong and more than sufficient to warrant a conviction.

## II

Brokenbrough's second argument gives us considerable concern. Once again, we are called upon to consider a criminal appeal in which it is alleged that the prosecutor's improper and prejudicial statements to a jury denied the defendant his right to a fair and impartial trial.

On at least two occasions in recent years, this Court has discussed the permissible bounds of comment by the prosecution in closing arguments. *See Sexton v. State,* Del.Supr., 397 A.2d 540 (1979) and *Hooks v.*

*State*, Del.Supr., 416 A.2d 189 (1980). In *Sexton*, the Court stated:

"Not every improper remark by a prosecutor requires reversal, but only that which prejudicially affects substantial rights of the accused. Super.Ct.Crim.R. 52(a); *Edwards v. State*, Del.Supr., 320 A.2d 701 (1974).

Although the prosecutor operates within an adversary system, his duty is to seek justice, not merely convictions.

'A prosecuting attorney represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial.' *Bennett v. State*, [3 Storey 36] Del. Supr., 164 A.2d 442, 446 (1960).

That same duty requires the prosecutor to refrain from legally objectionable tactics calculated to arouse the prejudices of the jury." 397 A.2d at 544.

In *Sexton* we also quoted, with tacit if not express approval, the following ABA standards, the Prosecution and Defense Functions (Approved Draft, 1971):

"1.1 The function of the prosecutor.

(a) The office of prosecutor is an agency of the executive branch of government which is charged with the duty to see that the laws are faithfully executed and enforced in order to maintain the rule of law.

(b) The prosecutor is both an administrator of justice and an advocate; he must exercise sound discretion in the performance of his functions.

(c) The duty of the prosecutor is to seek justice, not merely to convict.

\*      \*      \*      \*      \*      \*

5.5 Opening statement.

In his opening statement the prosecutor should confine his remarks to evidence he intends to offer which he believes in good faith will be available and admissible and a brief statement of the issues in the case. It is unprofessional conduct to allude to any evidence unless there is a good faith and reasonable basis

for believing that such evidence will be tendered and admitted in evidence.

\*      \*      \*      \*      \*      \*

5.6 Presentation of evidence.

\*      \*      \*      \*      \*      \*

(b) It is unprofessional conduct for a prosecutor knowingly and for the purpose of bringing inadmissible matter to the attention of the judge or jury to offer inadmissible evidence, ask legally objectionable questions, or make other impermissible comments or arguments in the presence of the judge or jury.

\*      \*      \*      \*      \*      \*

5.8 Argument to the jury.

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

\*      \*      \*      \*      \*      \*

5.9 Facts outside the record.

It is unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record whether at trial or on appeal, unless such facts are matters of common public knowledge based on ordinary human experience or matters of which the court may take judicial notice."

The second case was *Hooks*, where this Court wrote as follows:

The prosecutor in his final summation should not be confined to a repetition of the evidence presented at trial. He is allowed and expected to explain all the legitimate inferences of the appellants' guilt that flow from that evidence. *State v. Mayberry*, N.J.Supr., 52 N.J. 413, 245 A.2d 481 (1968), *cert. den.* 393 U.S. 1043 [89 S.Ct. 673, 21 L.Ed.2d 593]

(1969). The prosecutor, nevertheless, must remember his unique position within the adversary system. '[I]t is fundamental that his obligation is to protect the innocent as well as to convict the guilty, to guard the rights of the accused as well as to enforce the rights of the public.' ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, The Prosecution Function, § 1.1, Commentary at 44 (Approved Draft, 1971), (hereinafter ABA Standards).... This Court has expressed similar sentiments in *Bennett v. State*, Del.Supr., 3 Storey 36, 164 A.2d 442, 446 (1960):

> 'A prosecuting attorney represents all the people, including the defendant who was being tried. It is his duty to see that the State's case is presented with earnestness and vigor, but it is equally his duty to see that justice be done by giving defendant a fair and impartial trial.'

These general comments extend to the propriety of the content of closing argument as well as to the other aspects of a criminal trial. Closing argument is 'an aspect of a fair trial which is implicit in the Due Process Clause of the Fourteenth Amendment by which the States are bound.' *Donnelly v. DeChristoforo, supra.* 416 U.S. [637] at 649 [94 S.Ct. 1868, at 1874, 40 L.Ed.2d 431] (dissenting opinion of Justice Douglas). '[T]he process of constitutional line drawing in this regard is necessarily imprecise ...' *Id.* 416 U.S. at 645 [94 S.Ct. at 1872] (Justice Rehnquist's opinion for the Court). Indeed, it is frequently difficult to ascertain whether courts are speaking of errors so fundamentally unfair as to deny the defendant due process or whether courts are merely exercising their supervisory power to curtail prosecutorial misconduct. But, in either event, the ethics of the legal profession are in issue...." 416 A.2d at 204–5. (citations omitted).

We concluded our opinion in *Hooks* with the observation that we had considered the contentions concerning the impropriety of the prosecutor's summation at length because we viewed those contentions as "significant and because we hope for improved standards of trial conduct." *Hooks v. State*, 416 A.2d 189 at 208. This hope has not been realized.

In the year immediately following our decision in *Hooks*, this Court reversed a first degree murder conviction in a close circumstantial case due to the prosecutor's improper closing argument. *Hughes v. State*, Del.Supr., 437 A.2d 559, 572 (1981). In *Hughes*, once again we set out the foregoing quotes from *Sexton* and *Hooks*. We also adopted a three-prong test for determining whether improper prosecutorial remarks require the reversal of a conviction because they have prejudicially affected substantial rights of the accused. The three-prong test which we adopted in *Hughes* requires us to look at: (1) the centrality of the issue affected by the alleged error; (2) the closeness of the case; and (3) the steps taken to mitigate the affects of alleged error. *Hughes v. State*, Del.Supr., 437 A.2d at 571.

■ The question presented by Brokenbrough is whether the prosecutor's remarks, if improper, "prejudiced defendant['s] right to a fair trial" *Hooks v. State*, Del.Supr., 416 A.2d at 205. Here, it must be noted that all but one of the statements of the prosecutor (which defendant now contends severely prejudiced his right to a fair trial) were permitted to pass without objection at trial. This Court has repeatedly emphasized the necessity of timely objection to improper closing argument of opposing counsel, *Hooks v. State*, 416 A.2d at 203. Failure to make a contemporaneous objection to prejudicial statements generally constitutes a waiver of the right to raise such alleged errors on appeal. *Goddard v. State*, Del.Supr., 382 A.2d 238 (1977). Thus, our standard of review as to three of Brokenbrough's allegations is whether the prosecutor's statements amounted to plain or fundamental error so as to "clearly deprive [defendant] of a substantial right, or which clearly show manifest injustice." *Ward v. State*, Del.Supr., 366 A.2d 1194, 1197 (1976); *Hooks v. State*, 416 A.2d at 204; *see also Ross v. State*, Del.Supr., 482

A.2d 727 (1984) *cert. den. Ross v. Delaware*, 469 U.S. 1194, 105 S.Ct. 973, 83 L.Ed.2d 976 (1985). There are four specific allegations that the prosecutor made improper closing comments requiring reversal. We will examine the closing arguments of the prosecutor in this case according to the standards enunciated in *Sexton, Hooks,* and *Hughes.*

■ First, Brokenbrough alleges that the prosecutor attempted to inflame the passions and prejudices of the jury by calling the appellant a "devil." The record reflects that the prosecutor did not directly call Brokenbrough a devil but insinuated this by analogy. Specifically, the prosecutor argued:

> "There is a saying that is used by one of the attorneys who used to be a prosecutor some years ago. It says sometimes you have to be a sinner to catch the devil and I suggest to you that the role that Mary Scott played in this case is similar to that of a sinner. She was wrong."

Such a characterization is impermissible. In *Hooks,* we held that to the extent the prosecutor brought the issue of religious beliefs before the jury, such assertions are improper as appealing to the jury's passions and prejudices rather than to their reasoned responses, the proper tools for deciding a case. *Hooks v. State,* 416 A.2d at 205. The commentators to the ABA Standards for the Prosecution function state unequivocally that "arguments which rely upon racial, religious, ethnic, political, economic, or other prejudices of the jurors introduce elements of irrelevance and irrationality into the trial which cannot be tolerated in a society based upon the equality of all citizens before the law." Commentary to ABA Standards, Prosecution and Defense Function § 5.8(c). Brokenbrough's attorney immediately objected to this statement by the prosecutor and requested a mistrial. The Superior Court agreed that the prosecutor's statement was impermissible but refused to grant a mistrial. Instead, the Superior Court instructed the jury to "disregard the last comment of the Deputy Attorney General with reference to

it takes a sinner to catch the devil." This Court has recently held that even when prejudicial error is committed, it will usually be cured by the trial judge's instruction to the jury to disregard the remarks. *Diaz v. State,* Del.Supr., 508 A.2d 861, 866–867 (1986). *See also Edwards v. State,* Del.Supr., 320 A.2d 701 (1974) and *Burton v. State,* Del.Supr., 457 A.2d 738 (1983). We find that the defense counsel's objection and the Superior Court's immediate instruction to the jury to disregard the prosecutor's statement mitigated the effects of the comment and cured the prosecutor's error. Cf. *Edwards v. State,* 320 A.2d at 703 and *Boston v. State,* Del.Supr., 457 A.2d 738, 743 (1983).

■ The second comment by the prosecutor that Brokenbrough finds objectionable came in the rebuttal portion of the State's closing argument:

> "We don't prosecute people, ladies and gentlemen, for anything other than criminal acts. We don't prosecute people for being gullible. We don't prosecute people for not being smart. If we did I suggest everyone of us would be prosecuted in some point in time in our lives. We are here because of a criminal offense being alleged to have been committed by the Defendant. Not because anybody is gullible. Not because anybody wasn't too smart. Not because anybody was a friend."

Brokenbrough argues that these statements give the jury the impression that the State only prosecutes guilty persons. The State responds that these comments were proper because they were in direct response to arguments made by the co-defendant's attorney that his client was "gullible" and "wasn't smart for doing this." The State also argues that the comment must be examined in context of the remarks which followed and which included reference to the fact that the trial was a result of the defendant's indictment.

Both of the State's arguments in justification of this type of argument are in error. In *Hughes,* we held that language which infers that the State will not arrest someone until it is certain of his guilt is

prejudicial and destroys the presumption of innocence. *Hughes v. State*, 437 A.2d 559 at 573. Similarly, there is no legal support for the State's argument that this improper comment was invited by co-defendant's counsel.

Courts have sometimes invoked what is called the "invited response" or "invited reply" rule which the United States Supreme Court recently addressed in *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1985). In those situations, an improper defense argument has provoked a prosecutor to respond in kind. "Clearly, two improper arguments—two apparent wrongs—do not make for a right result." *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). Yet, in the case at bar, the argument of the co-defendant's counsel was entirely proper. Therefore, the State's position that its improper remark should be excused because it was invited by defense counsel's improper remark is not supported by the record. However, since Brokenbrough's attorney failed to object to these comments by the prosecutor at trial, to justify reversal, such remarks would have to have been so prejudicial as to constitute plain error. *Sexton v. State*, Del.Supr., 397 A.2d at 540. In the context of this trial and in the context that they were made, we do not find plain error in these particular comments.

■ The third portion of the State's closing argument which Brokenbrough takes issue with on appeal, despite the absence of an objection at trial, is as follows:

"Well, *I suggest to you* that as Mrs. Sabbagh said they knew I lived out of the country. No one expected the State to be able to produce Mrs. Sabbagh in rebuttal. *I suggest to you* that they picked a safe bet. Mrs. Sabbagh was available. Mrs. Sabbagh told you she was in Bangladesh on March 5, 1985. She had her vacuum cleaner fixed once in her life and it was in December or January. December of '84 or January of '85. Well, ladies and gentlemen, I would submit the evidence very clearly. John Brokenbrough wasn't in Wilmington and Mr. Sutler was not in Wilmington on that day at Mrs. Sabbagh's house and *I suggest to you* that the document is not worth the paper it is printed on." (emphasis added).

In *Hughes*, this Court *specifically adopted* the ABA Standards relating to the Prosecution and Defense Functions. *Hughes v. State*, Del.Supr., 437 A.2d 559, 567 (1981). Section 5.8 addresses the prosecutor's argument to the jury and states, in part,

(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

Rule 3.4(e) of the Delaware Rules of Professional Conduct also prohibits an attorney at trial from asserting "personal knowledge of facts in issue except when testifying as a witness, or stat[ing] a personal opinion as the justness of a cause, the credibility of a witness, the culpability of a civil litigant or the guilt or innocence of an accused." The commentary which follows § 5.8 of the ABA Standards recognizes that expressions of personal beliefs by a prosecutor are a form of unsworn, unchecked testimony intended to exploit the influence of his office and undermine the *objective detachment* which should *separate* a lawyer from the cause which he argues. "Such argument is expressly forbidden." See Commentary relating to ABA Standard 5.8, Prosecution and the Defense Function.

As the ABA commentators point out "this type of argument is easily avoided by insisting that lawyers restrict themselves to statements which take the form '*the evidence shows.*'" *Id.* An example is *Harris v. United States*, 402 F.2d 656, 657–659 (D.C.Cir.1968). In *Harris*, Chief Justice Burger noted that the prosecutor used the universally accepted and proper form of comment on the contradictions and testimony at one point in his closing statement when he told the jury "... Mr. Harris would urge upon you at the time he got this car it was about 8:00 and if you believe Mr. Harris, if he got the car at 8:00, then you must disbelieve Mr. Gray ..." *Id.* at 658, Note 3.

In this case, the prosecutor should have argued to the effect that "Mr. Brokenbrough and his alibi witness, Mr. Sutler would have you believe that they obtained a receipt from Mr. Sabbagh on March 5. Mrs. Sabbagh has testified that she was in Pakistan on that date. If you are to believe Mr. Brokenbrough and Mr. Sutler, then you must disbelieve Mrs. Sabbagh. If you believe Mrs. Sabbagh, then you must disbelieve that Brokenbrough and Sutler received the receipt which is in evidence from Mrs. Sabbagh on March 5."

In a closing argument, the use of the word "I" only serves to emphasize for the jury that the prosecutor, i.e. the speaker, personally believes the point that is being submitted to the jury for its consideration. When the prosecutor argues to the effect that "I suggest to you that the document is not worth the paper it is printed on," as she did in this case, there is no alternative interpretation to such a statement than to conclude that the prosecutor personally believes the paper is worthless. This type of argument is contrary to the ABA Standards and the Delaware Rules of Professional Responsibility.

In the future, in the event that there is a contradiction in testimony, the universally accepted and proper form of comment on those contradictions should be used. This form is clearly identified in *Harris v. United States*, 402 F.2d at 658, Note 3. We do not adopt a rule which says that the use of the word "I" or "we" in a closing argument is *per se* improper. In fact, the ABA Commentators indicate that the experienced American and British advocate will often say "I leave it to you whether this evidence does not suggest ...". There is a great difference in "leaving" a point before the jury and "suggesting" it personally. Nevertheless, arguments in the first person are extremely dangerous and should be assiduously avoided. As the ABA Commentators concluded:

"The line between permissible and impermissible argument is a thin one. Neither advocate may express his personal opinion as to the justice of his cause or the veracity of witnesses. Credibility is solely for the triers, but an advocate may point to the fact that circumstances or independent witnesses give support to one witness or cast doubt on another. The prohibition goes to the advocate's personally endorsing or vouching for or giving his opinion; the cause should turn on the evidence, not on the standing of the advocate, and the witnesses must stand on their own." Commentary ABA Standards relating to the Prosecution Function and the Defense Function, page 128.

The scales of justice must never be tipped by the prosecutor's personal beliefs or by the weight of the prosecutor's office.

Our review of the personal argument in this case is similar to a prior analysis by the United States Third Circuit Court of Appeals when it adopted the ABA prosecution standards more than a decade ago. *United States v. LeFevre*, 483 F.2d 477 (3rd Cir.1973). In *LeFevre*, Chief Judge Seitz held that the Third Circuit and the ABA standards condemned expressions of personal opinion by prosecutors relating to credibility and guilt, even when it was clear that the comments of personal opinion by the prosecutor in his closing argument were based on the evidence. *Id.* Despite its condemnation and disapproval of the prosecutor's closing argument, the Court in *LeFevre* concluded that in light of the overwhelming evidence against the defendant, the argument of the prosecutor was not sufficiently prejudicial so as to constitute reversible error. We reach the same conclusion in this case. The prosecutor's remarks were clearly improper but not plain error.

■ The final portion of the closing argument that Brokenbrough objects to on appeal is perhaps the most troubling. The prosecutor argued:

"The defense has shown no motive for Miss Scott to pick of all the people in Carlyle Gardens, Mr. Brokenbrough, a person who, from his own admission, has previously been busted for *selling* drugs. He told you that from the witness stand."

The State concedes that there was no testimony at the trial that Brokenbrough was "busted for *selling* drugs." On appeal, the State acknowledges that this characterization was incorrect and came about as a result of the prosecutor's mistaken recollection of the facts. We will consider this alleged error, even though no objection was made at trial, because the nature of the erroneous comment is so central to the nature of the charge that the interest of justice requires that we do so. See Supreme Court Rule 8. Cf. *Hughes v. State*, Del.Supr., 437 A.2d 559 (1981).

This situation is analogous to one that this Court confronted in *Boatson v. State*, Del.Supr., 457 A.2d 738 (1982). In *Boatson*, the prosecutor's closing comments also included inaccuracies. The prosecutor in *Boatson* stated that the erroneous comments were a result of an honest mistake. The prosecutor in this case offers the same explanation. The record reflects that Brokenbrough not only had prior drug involvement but simultaneously had other drug charges pending that arguably could have led to the prosecutor's confusion. Our examination of the record leads us to conclude that the prosecutor's reference to "selling drugs" was extremely careless but not made in bad faith. In *Boatson* we concluded that although we did not find that the prosecutor's action rose to the level of misconduct indicating bad faith, it did require repetition of the *Hooks* admonition:

> "If there is a growing tendency towards carelessness on the part of counsel, whether caused by inexperience, excessive zeal, or otherwise, it should be discouraged and not condoned by inaction." *Hooks v. State*, 416 A.2d at 204.

Having reached this conclusion, we must still determine whether the remarks in the instant case so affected Brokenbrough that his substantial rights were prejudiced in a manner that requires reversal. As in *Boatson*, we look to the three-prong test adopted by this Court in *Hughes*. (1) the centrality of the issue affected by the alleged error; (2) the closeness of the case; and (3) the steps to mitigate the effects of the alleged error. *Hughes v. State*, 437 A.2d at 571.

Applying the test to the instant case, we first note that Brokenbrough was charged with *selling* drugs. The erroneous statement by the prosecutor was clearly central to the charge. Moreover, the defense attorney did not object to this portion of the prosecutor's closing argument and the trial court took no steps *sua sponte* to ameliorate the effects of the alleged error. Therefore, our primary focus must be on the closeness of the case. We find that the case was not close, for the reasons we have already outlined. The State presented a strong case. The State's case was not seriously questioned by Brokenbrough's inconsistent alibi defense that was completely contradicted by the testimony of an independent third party. We hold that the prosecutor's remarks, although improper, did not deprive Brokenbrough of a fair trial. Compare *Hughes*, 437 A.2d at 566–73.

### III

Once again, we have just completed what has unfortunately become a familiar exercise in judicial review. The hope that this Court expressed in *Hooks* for "improved standards of trial conduct" has not been realized. In fact, a review of the cases that have been decided following *Hooks* is disturbing. Two years after our holding in *Sexton* and one year after our admonition in *Hooks*, as we stated earlier, we reversed a first degree murder conviction in a close circumstantial case because of prosecutorial misconduct during closing arguments. *Hughes v. State*, 437 A.2d 559 (1981). In the year immediately following *Hughes*, we reversed another first degree murder conviction for prosecutorial misconduct during closing argument characterized as "sandbagging." *Bailey v. State*, 440 A.2d 997 (1982). In *Bailey*, we restated our holding in *Hooks* that "closing argument is an aspect of a fair trial which is implicit in the due process clause of the Fourteenth Amendment by which the States are bound." *Id.* at 1003.

Reported decisions of this Court following *Sexton, Hooks* and *Hughes* are disturbing not only because our admonitions have gone unheeded but because the same types of error have been repeated as an examination of several reported decisions by this Court shows. We emphasize here only a few reported decisions from this Court but take notice of the fact that this Court has also been called upon to address the same subject area in Orders that are not reported.[1]

In 1983, this Court decided *Boatson v. State*, Del.Supr., 457 A.2d 738 (1983). In *Boatson* we found the prosecutor's remark, although improper, did not deprive the defendant of a fair trial. We repeated the concern that had been raised in *Hooks* that there was a growing tendency towards carelessness on the part of counsel which should be discouraged and not condoned by inaction.

Less than a year later, we were confronted with *Ross v. State*, Del.Supr., 482 A.2d 727 (1984). In *Ross*, the defendant listed many instances of alleged prosecutorial misconduct during closing argument which he claimed cumulatively deprived him of his right to a fair trial.[2] In *Ross* we found that the prosecutor's remarks were not necessary or appropriate. In fact, we held that the prosecutor did not measure up to the standards enunciated by this Court in *Hooks. Ross v. State*, 482 A.2d at 742.

In 1985, we issued opinions concerning statements by prosecutors during closing arguments on at least four separate occasions. In 1985, we held that it was inappropriate for the prosecutor in his rebuttal summation to impune the credibility of defense counsel. However, we concluded that under the circumstances of the case, the danger of prejudice to the defendant, if any, was minimal. *Michael Williams v. State*, 491 A.2d 1129 (1985) *cert. den. Williams v. Delaware*, — U.S. ——, 106 S.Ct. 78, 88 L.Ed.2d 64 (1985).

One month after *Williams*, we issued another opinion where we were called upon to review a prosecutor's closing argument in a case involving a charge of first degree murder. *Whalen v. State*, Del.Supr., 492 A.2d 552, (1985). In *Whalen*, we found that the prosecutor should not have referred to the number of years the jurors had to think about the case. *Id.* We also found that the prosecutor erred in discussing the mitigating factors offered by the defense. *Id.* However, once again we concluded that the cumulative affect of the prosecutor's erroneous remarks had not materially prejudiced the defendant. *Id.*

One month after issuing our decision in *Whalen*, we admonished a prosecutor for making a closing summation that improperly referred to matters that were not in evidence. However, once again we found the inappropriate statements by the prosecutor during closing to be harmless error under the circumstances of the case. *Jo-*

---

1. We also note that improper closing arguments by prosecutors have frequently been addressed by the Superior Court. In 1983, the Superior Court admonished a prosecutor for improperly vouching for the credibility of a witness, *State v. Saunders*, No. IN76–07–0876, Slip op. (Del.Super. Aug. 19, 1983). In a separate case the Superior Court also admonished the prosecutor for offending remarks in closing that were classified as (1) comments on the defendant's silence upon arrest; (2) statements concerning the defendant's veracity; (3) references to the defendant's emotional demeanor; (4) an analogy between defendant and Charles Manson; and (5) an illusion to judgment in the eyes of God. *State v. Hamilton*, C.A. No. 492, 1974.

2. These included: (1) the prosecutor's gratuitous injection of irrelevant subjects; (2) his statement that defense counsel was asking irrelevant questions "to confuse you" and "to put sawdust in your eyes"; (3) his self-laudatory statements and his characterization of his role as fulfilling "a public trust ... to the people [of] Delaware"; (4) his belittling comments on the value of expert testimony by psychiatrists and psychologists; (5) his characterization of the defense as presenting a "grab-bag" scenario by raising inconsistent defenses of mental illness and extreme emotional distress in hope of a compromise verdict; (6) his reference to defendant's psychiatric expert as tailoring his report to the amount of compensation received; (7) his analogy of defendant's infatuation with death to whether predisposition is a defense to entrapment, a non-issue; (8) his characterization of defendant as a "fool" whose fascination with death resulted in the killing; and (9) his misstatements of the evolution of the Delaware law on extreme emotional distress as a defense and its elements.

*seph Williams v. State*, Del.Supr., 494 A.2d 1237 (1985). In the summer of 1985, we issued an opinion in another murder case that addressed the prosecutor's summation. *Riley v. State*, Del.Supr., 496 A.2d 997 (1985) *cert. den. Riley v. Delaware*, —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1985). In *Riley*, we found that four of the criticized statements were improper in varying degrees. However, we again concluded that the improper statements represented the *same kind* of remarks that we had addressed in previous opinions and found, in the context of the whole trial, not to have risen to the level of constitutional error. *Riley v. State*, 496 A.2d at 1023–24.

In 1986, we affirmed a second degree murder conviction despite our concern about the prosecutor's closing argument. *See Diaz v. State*, Del.Supr., 508 A.2d 861 (1986). That case was not close. The defense attorney objected promptly, and the trial court gave a cautionary instruction to the jury to decide the case solely on the evidence presented and to disregard the prosecutor's remark. *Id.*

In another murder case that year, we found the prosecutor's closing argument improper and unacceptable. *Fensterer v. State*, Del.Supr., 509 A.2d 1106 (1986). Finally, in 1986, we were forced to reverse a robbery conviction not because of the State's closing argument but because of prosecutorial tactic which we found to be overreaching, improper, and beneath acceptable standards of prosecutorial conduct. *Bowe v. State*, Del.Supr., 514 A.2d 408, 411 (1986).

Other Courts have also addressed the failure of prosecutors to make proper closing arguments despite repeated admonitions. *See United States v. Bivona*, 487 F.2d 443 (2d Cir.1973) [3]; *United States v. Farnkoff*, 535 F.2d 661, 668, n. 17 (1st Cir.1976); *United States v. Freeman*, 514 F.2d 1314, 1321 (D.C.Cir.1975) vacated on other grounds, 598 F.2d 306 (D.C.Cir.1979); *Harris v. The United States*, 402 F.2d 656,

659 (D.C.Cir.1968). Prosecutorial misconduct in closing argument, despite repeated admonitions, has not only been the subject of judicial scrutiny for many years but more recently has been examined by various commentators. *See* Gershman *The Burger Court and Prosecutorial Misconduct*, 21 Criminal Law Bulletin, 217 (1985); Gershman *Why Prosecutors Misbehave*, 22 Criminal Law Bulletin, 131 (1986); and Caldwell *Name calling at Trial: Placing Parameters on the Prosecutor*, 8 American Journal of Trial Advocacy, 386 (1985).

This Court, like other courts, must effectively solve this problem. It is urged in this case, as it has been in other cases, that a reversal would have a more powerful impact on prosecutorial misconduct in the future than a mere reprimand. However, we conclude that where the prejudice to the defendant was negligible and the guilt clear, reversal is simply too drastic a measure. Where defendant's Constitutional rights have been violated by the prosecutor, this sanction must always be applied. Cf. *Hughes v. State*, 437 A.2d 559 (1981) and *Bailey v. State*, 440 A.2d 997 (1982). But "to adopt this approach in response to comments, which in the context of the whole trial, fall far short of Constitutional infringement, would be sacrificing too much." Cf. *United States v. Bivona*, 487 F.2d 443, 447 (2nd Cir.1973). Having reached this conclusion, however, we do more to exacerbate than to ameliorate the problem. We are not unmindful of Judge Frank's admonition:

> The deprecatory words which we use in our opinions ... are purely ceremonial. Government counsel, employing such tactics, are the kind who, eager to win victories, would gladly pay the small price of a ritualistic verbal spanking. The practice of this Court—recalling the bitter tears shed by the walrus as he ate the oyster—breeds a deplorably cynical attitude toward the judiciary. *United States v. Antonelli Fireworks Co.*, 155

**3.** The Second Circuit decision in *Bivona* was preceded by its decision in *United States v. White*, 486 F.2d 204 (2nd Cir.1973) *cert. den. White v. United States*, 415 U.S. 980, 94 S.Ct. 1569, 39 L.Ed.2d 876 (1974). In *White*, the Court noted that in at least six cases in the preceding six months, appellants had included allegations of prosecutorial misconduct at trial among their claims of error on appeal. *Id.* at 206, Note 4.

F.2d 631, 661 (2nd Cir.) (Frank, J. dissenting), *cert. den.* 329 U.S. 742, 67 S.Ct. 49, 91 L.Ed. 640 (1946).

The problem we must solve arises in cases where the defendant's Constitutional rights are not denied by the prosecutor's improper comments and a conviction is not reversed because of the strength of the State's case. When the State's case is strong against an accused, the error may be harmless, but it is also absolutely inexcusable. In such a situation, the United States Supreme Court has stated that prosecutors might properly be criticized for a lack of judgment or incompetence in jeopardizing an unanswered or unanswerable case. *United States v. Hastings*, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). In *Hastings*, the United States Supreme Court suggested that the improper closing argument could have been dealt with by a trial court order for the prosecutor to show cause why he should not be disciplined. *Id.* 103 S.Ct. at 1979, Note 5.

In *Hooks, Bailey,* and *Hughes*, we have held that the trial judge must control the conduct of the court's officers and the trial judge should act at times even without an objection. *See Hooks v. State*, 416 A.2d at 204. These sentiments have most recently been reiterated by Chief Justice Burger:

> ... courts must not lose sight of the reality that '[a] criminal trial does not unfold like a play with actors following a script.' *Geders v. United States*, 425 U.S. 80, 86 [96 S.Ct. 1330, 1334, 47 L.Ed.2d 592] (1976). It should come as no surprise that 'in the heat of argument, counsel do occasionally make remarks that are not justified by the testimony, and which are, or may be, prejudicial to the accused.' *Dunlop v. United States*, 165 U.S. 486, 498 [17 S.Ct. 375, 379, 41 L.Ed. 799] (1897).

We emphasize that the trial judge has the responsibility to maintain decorum in keeping with the nature of the proceeding; 'the judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct.' *Quercia v. United States*, 289 U.S. 466, 469 [53 S.Ct. 698, 699, 77 L.Ed. 1321]

(1933). The judge 'must meet situations as they arise and [be able] to cope with ... the contingencies inherent in the adversary process.' *Geders v. United States, supra.* 425 U.S. at 86, 96 S.Ct. at 1334. Of course, 'hard blows' cannot be avoided in criminal trials; both the prosecutor and defense counsel must be kept within appropriate bounds. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985). We will continue to look to the trial courts to assure the highest standards of trial advocacy.

As Justice Brennan has observed "it is difficult to imagine that a series of intentional violations of defendant's constitutional rights by governmental prosecutors, who are officers of the Court, charged with upholding the law, would not have a considerable detrimental effect on the integrity of the process and call for judicial action designed to restore order and integrity to the process." *United States v. Hastings*, 461 U.S. 499, 522, 103 S.Ct. 1974, 1987, 76 L.Ed.2d 96 (1983). Repetition of the same type of errors by prosecutors in closing arguments, despite repeated reported admonitions can only be construed as either intentional misconduct or careless and unprofessional.

In an effort to restore order and integrity to the judicial process, trial courts must take appropriate disciplinary action for performance deficiencies by attorneys generally and during closing arguments specifically. This can be done by trial courts by a rule to show cause as suggested by the United States Supreme Court or by any other *effective* method to insure adherence to acceptable professional standards. Rule 33 of this Court provides that discipline for performance deficiency may be imposed for: "(i) persistent failure to abide by or comply with the rules, orders or directives of the Court or its staff (ii) submission of briefs, oral argument or other communications to the Court or its staff that are lacking in candor or grossly below customary professional standards." Supreme Court Rule 33(b). Rule 33 also provides that disciplinary action for performance deficiency may include one or more of the

following sanctions against the offending attorney: "(i) imposition of costs, expenses and reasonable attorneys' fees; (ii) a fine in such amount as the Court determines; (iii) disqualification from submitting papers and appearing before the Court for a period of up to 90 days; (iv) a private or public reprimand; or (v) such other sanction as the Court deems appropriate." *Id.* All trial courts should adopt and enforce a similar rule with similar sanctions.

We have examined the comments of the prosecutor in this case and conclude that taking them individually or collectively, Brokenbrough was not substantially prejudiced and was not denied a fair trial. However, as Chief Justice Burger stated:

> We take this occasion to remind the bar again that departures from accepted standards of closing argument, whether by prosecution or defense, should not occur. Although we do not elect to impose the sanction of a reversal, all members of the bar are on notice that disciplinary mechanisms are available to the trial courts to deal with unlawyerlike behavior. Lawyers who fail to learn or remember the rules of courtroom conduct may need the forcible reminders which will tend to upgrade the courtroom performance of lawyers generally.

*Harris v. United States,* 402 F.2d 656 (D.C. Cir.1968).

In holding the harmless error rule governs even Constitutional violations under some circumstances, the United States Supreme Court recognized that, "given the myriad of safeguards provided to assure fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error free, perfect trial, and that the Constitution does not guarantee such a trial." *United States v. Hastings,* 461 U.S. at 508–509, 103 S.Ct. at 1980 (1983). However, Delaware courts *will* provide safeguards against a repetition of the same type of specific conduct that had been held to be error, *albeit* harmless error. A repetition of the same type or category of errors adversely affects the integrity of the judicial process. The standards of professional conduct in Delaware have never been and will never be measured by the lowest acceptable common denominator.

We fully expect that our criticism here will not fall on deaf ears and that judicial admonition, even in the absence of reversal, will encourage the curtailment of the type of improper closing arguments we have been repeatedly called upon to review. In the future, such conduct will not be tolerated by this Court and must not be permitted by trial courts. Cf. *United States v. Bivona,* 487 F.2d 443, 447 (1973).

The conviction of the defendant is AFFIRMED.