# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

STATE OF DELAWARE,              )
                               )
          Plaintiff,            )
                               )
                               )
                               )
     v.                        )     Cr. ID. No.  0909018475A & B
                               )
                               )
                               )
                               )
MICHAEL WASHINGTON,            )
                               )
          Defendant.           )

Date submitted: June 15, 2016
Date decided: September 27, 2016

## COMMISSIONER'S REPORT AND RECOMMENDATION ON DEFENDANT'S PRO SE MOTION FOR POSTCONVICTION RELIEF AND RULE 61 COUNSEL'S MOTION TO WITHDRAW

Karin M. Volker, Esquire, Deputy Attorney General, Delaware Department of Justice, 820 N. French St. 7th Floor, Criminal Division, Wilmington, Delaware, 19801, Attorney for the State.

Andrew J. Witherell, Esquire, 100 East 14th Street, Wilmington, Delaware 19801, Attorney for the Defendant.

Michael Washington, *pro se*.

**MANNING, Commissioner**

This 27th day of September, 2016, upon consideration of defendant Michael

Washington's Amended Motion for Postconviction Relief ("Motion"), I find and

recommend the following:

## FACTS

The facts of this case, as summarized by the Delaware Supreme Court in

Washington's direct appeal, are as follows:

> It appears from the record that Francis and Guy were found shot to death on September 1, 2008 (hereinafter "the shooting") in the front seat of a bullet-ridden black Lexus (hereinafter "the vehicle") in the 500 block of E. 10th Street. The first police officer to arrive at the scene found the vehicle stopped in the middle of traffic, still in gear and wedged against another car.
>
> Detective John Ciritella of the Wilmington Police Department (hereinafter "Ciritella") was assigned to investigate the shooting. As the investigation unfolded, Ciritella theorized that the shooting occurred from inside the vehicle as it was leaving the 700 block of E. 10th Street and that the vehicle continued moving until it came to a stop in the 500 block.
>
> Ciritella recovered a significant number of bullets, bullet fragments and/or shell casings, from the interior of the vehicle, the 700 block of E. 10th Street, and the victims' bodies following the medical examiner's autopsies. Ciritella did not, however, recover a weapon that was used in the shooting.
>
> At trial, Ciritella testified that initially and for several months after the shooting, he could not develop a lead on a suspect. Finally, however, in April 2009, Ciritella was advised that an inmate in federal custody, Christopher Waterman, was interested in disclosing information about the shooting that he had allegedly heard from another inmate. The other inmate turned out to be Washington. Similarly, in May 2009 and December 2009, Ciritella learned that inmates William Coleman and

1

Isaiah Fields also wanted to disclose information that another inmate, again Washington, purportedly told each of them about the shooting. Ciritella conducted individual one-on-one interviews with Waterman, Coleman and Fields. As a result of those interviews, Ciritella learned that between the fall of 2008 and the spring of 2009, Washington allegedly individually told Waterman, Coleman and Fields at different times that he was either in the vehicle during the shooting or that he was the shooter, and that the weapon involved in the shooting was a "Mac 10," which Ciritella knew was a candidate weapon. Ciritella also learned from Waterman, Coleman and Fields that the shooting was possibly the result of a botched robbery or a dispute over a drug deal, and that the gun had discharged unexpectedly in the vehicle.

Ciritella learned additional information from Coleman about Washington's possible involvement in the shooting, namely that Washington was worried that a resident of the 700 block of E. 10th Street, April Gardner, had witnessed the shooting. Moreover, Fields told Ciritella that he was with Washington in June or July 2008 at 930 Spruce Street, a drug hangout, when the "Mac 10" Washington was holding suddenly went off and sprayed gunfire.

As a result of his interview with Fields, Ciritella obtained a search warrant for 930 Spruce Street and in the ensuing search found a number of bullet holes in the floor and walls from which he recovered three bullets. From his interview with Coleman, Ciritella was able to locate Gardner at her 729 E. 10th Street home. Gardner told Ciritella that she witnessed the events leading to the shooting on September 1, 2008 from the front steps of her home.

At trial, Gardner testified that, prior to the shooting, she was outside sitting on her front steps watching her grandson ride his bicycle when she observed Washington and another male—later identified as Guy—walking down 10th Street. Gardner told the jury that she knew Washington because he had grown up in the neighborhood and had gone to school with her children.

Gardner testified that she observed Washington and his companion approach another man who was sitting in the driver's seat of a vehicle that was parked directly in front of her house. According to Gardner, after the three men conversed briefly, Guy got into the right front

2

passenger seat of the vehicle and Washington got into the right rear passenger seat.

Gardner testified that moments after the two men entered the vehicle the vehicle's windows "erupted." Shocked by the explosion, Gardner said, she immediately "grabbed [her] grandson" and ran to her daughter's house around the corner on Bennett Street where she remained for several hours before returning home. Gardner testified that as she ran from the scene, she could feel shards of glass getting caught in her hair, and that she had "glass all in [her] hair" when she reached her daughter's house. Gardner further testified that Washington came to her home later that evening "to apologize," but that she refused to speak to him.

At trial, the State's ballistics expert, Delaware State Police Firearms Examiner Carl Rone (hereinafter "Rone"), opined that the strafing of the vehicle's interior was the result of a semi-automatic or automatic weapon discharging more than thirty rounds inside the vehicle from the area of the right rear passenger seat. Rone further opined that the sixteen bullets and thirty spent shell casings he examined, which were recovered from the vehicle, the victims' bodies, and 930 Spruce Street, all came from the same semi-automatic or automatic weapon.

Washington testified at trial that he visited "Miss April" later in the evening on September 1, 2008, because he was sorry to hear that Leighton and Francis had been shot in front of her house, and that she had witnessed the shooting. Washington also testified that, a few days prior to the shooting, he had a conversation with Leighton and Guy, while in the vehicle, about a gun his cousin wanted to sell. According to Washington, the gun he was helping his cousin sell "hold[s] 30 rounds" and was "the same gun that went off in the house [on] 930 Spruce Street." Washington denied any involvement in the shooting, however, and he testified that at the time of the shooting he was "cooking up some drugs" at 930 Spruce Street.

*Washington v. State*, 2011 WL 4908250 (Del. October 14, 2011).

3

## Procedural History

Washington was arrested on September 28, 2009, and charged with two counts of Murder First Degree, two counts of Attempted Robbery First Degree, two counts of Possession of a Firearm During the Commission of a Felony and Possession of a Deadly Weapon by a Person Prohibited.[1] Following a nine day jury trial, Washington was found guilty on November 11, 2010, of two counts of Manslaughter and two counts of Possession of a Firearm by a Person Prohibited. Washington was found not guilty of the Attempted Robbery Charges. Washington was sentenced on February 11, 2011, to an aggregate of 86 years at Level V, suspended after 66 years, followed by decreasing levels of probation.

Washington appealed his conviction to the Delaware Supreme Court. Trial Counsel represented Washington on appeal but filed a motion to withdraw pursuant to Supreme Court Rule 26(c). On appeal, Washington raised two issues: (1) that the prosecutor committed misconduct when she made reference to a cell phone call during her opening statement that was never introduced at trial, and (2) that the State's ballistic expert testified at trial, contrary to his written report, that bullet fragments recovered in the 700 block of E. 10th street "matched" those recovered from the victim's bodies.

---

[1] The Possession of a Deadly Weapon by a Person Prohibited charge was severed prior to trial and constitutes the "B" case. Washington was convicted of this charge in a bench ruling following the jury trial on November 15, 2010. D.I. 46.

By Order dated October 14, 2011, the Delaware Supreme Court rejected Washington's arguments as meritless and upheld his convictions.[2] Washington then filed a timely *pro se* motion for postconviction relief pursuant to Super. Ct. Crim. Rule 61 on March 7, 2012.[3] Washington's Motion was originally assigned to Commissioner Reynolds, who retired while the matter was pending. Following the standard practice, Trial Counsel filed affidavits in responses to Washington's claims on April 20, 2012,[4] and May 1, 2012.[5] On May 8, 2012, Washington filed a "Motion to Amend Grounds and Expand the Record."[6] Over Trial Counsel's objections, Commissioner Reynolds granted Washington's request on May 11, 2012. Washington filed his Amended Motion for Postconviction Relief (hereinafter also the "Motion") on August 7, 2012.[7] On September 17, 2012, Trial Counsel filed new Affidavits in response to Washington's Amended Motion.[8] On October 31, 2012, the State filed its Response to Washington's Amended

---

[2] *Washington,* 2011 WL 4908250.

[3] D.I. 64.

[4] D.I. 70.

[5] D.I. 71.

[6] D.I. 72.

[7] D.I. 77.

[8] D.I. 82.

Motion.[9]    On January 9, 2013, Washington filed his Reply to the State's Response.[10]    On February 25, 2013, while his motion was pending decision, Washington filed a Motion for Appointment of Counsel.  Commissioner Reynolds denied this motion on April 30, 2013.[11]

On July 11, 2013, in light of the Delaware Supreme Court's recent decision in *Holmes v. State*,[12] This Court, *sua sponta*, vacated its April 30, 2013 ruling, and ordered that counsel be appointed to assist Washington with his Motion.  Counsel was appointed on August 26, 2013.  However, on April 30, 2014, counsel advised the Court that after spending considerable time working on the case, he discovered that he had a conflict of interest and asked to withdraw from representing Washington.  On July 15, 2014, new counsel was appointed for Washington; however, this attorney also moved to withdraw due to a conflict of interest.[13] Ultimately, Andrew Witherell was appointed to represent Washington on his Motion.  After a number of extensions to allow Rule 61 Counsel time to review the case, Mr. Witherell filed a Motion to Withdraw as Counsel on July 17, 2015,

---

[9] D.I. 86.

[10] D.I. 90.

[11] D.I. 98.

[12] 2013 WL 2297072 (Del. May 23, 2013).

[13] D.I. 112.

concluding that there were no meritorious issues he could advocate on Washington's behalf.[14]

On July 22, 2015, I wrote Washington and advised him that he had 30 days to file a response to Mr. Witherell's Motion to Withdraw. On August 10, 2015, Washington wrote and advised the Court that Mr. Witherell, despite being appointed counsel, had filed a motion to withdraw without ever having personally spoken with him. In light of this allegation, and in order to be satisfied that Mr. Witherell had fully reviewed Washington's case, I instructed Mr. Witherell to file an affidavit with the Court outlining, in detail, what work he did in connection with Washington's case prior to filing his motion to withdraw.[15] Mr. Witherell filed his affidavit on November 15, 2015. I have reviewed Mr. Witherell's affidavit and I am satisfied he thoroughly reviewed Washington's case prior to filing the motion to withdraw. Although it is certainly *the best practice* for a lawyer to meet his or her client face-to-face before filing a motion to withdraw, Washington was not prejudiced by Mr. Witherell's actions. However, because of this unusual occurrence, I allowed Washington extra time, at his request, to hire a private investigator and to amend or supplement his Rule 61 claims thereafter.[16]

---

[14] D.I. 125.

[15] D.I. 129.

[16] D.I. 138.

7

## Rule 61 Claims

Since filing his first Rule 61 motion on March 7, 2012, Washington has inundated the Court with letters and various other filings seeking to amend, expand and supplement his various Rule 61 claims. However, in a letter to the Court dated March 20, 2016, Washington instructed the Court to "only view the (4) issues on my Amended Motion and these (3) claims I'm supplementing. I did however provided [sic] other claims with my Amended Motion I thought had merit. But as of now I want you to ignore them as irrelevant when conducting your investigation."[17]

Pursuant to Rule 61(b)(6), a motion for postconviction may be amended anytime "before a response is filed or thereafter by leave of court, which shall be freely given when justice so requires." Considering the unique and tortured procedural history of this case, and the fact that Washington is serving what is tantamount to a life sentence, I have allowed Washington additional time to conduct further investigations and amend his claims as I believe it is in the interest of justice to do so. Finally, I note that on April 11, 2016, I forward to the State a copy of Washington's final Amended Motion and Supplemental Claims and offered the State an opportunity to reply—the State declined. On April 28, 2016, Washington filed yet another letter with the Court expounding upon his Rule 61

---

[17] *Id.*

8

claims. Although I have reviewed this letter, it is largely redundant and a recapitulation of the arguments he has already made in previous filings.

Based upon my review of Washington's Motion and a thorough review of the complete trial transcripts, I do not see the need for an evidentiary hearing. In my opinion, the arguments made by Washington in his Amended Motion[18] and Supplemental Claims, can be adequately addressed with the factual record created at trial.

I have summarized Washington's amended and supplemental claims for postconviction relief, in his own words, as follows:

Ground One: Trial Counsel was ineffective for failing to move to suppress the out-of-court hearsay statements of the State's witnesses.[19]

Ground Two: The Prosecutor committed plain error through the manipulation of facts mislead the jury as to the conditions of Christopher Waterman's federal plea agreement.[20]

Ground Three: The Prosecution committed plain error denying the defendant the right to a fair trial by manipulating trial evidence and vouching for the State's witnesses.[21]

Ground Four: Trial Court committed plain error by allowing Detective Ciritella to testify as an expert on the State's forensic evidence.[22]

---

[18] D.I. 139.

[19] D.I. 77 at 1.

[20] Id. 4.

[21] Id. 6.

9

<u>Supplemental Claim One</u>: The prosecution improperly interjected into the trial information regarding where the shooter was seated in the vehicle that was not factually supported based on the testimony of the State's ballistic expert, Carl Rone.[23]

<u>Supplemental Claim Two</u>: Prosecutorial Misconduct. The State improperly argued that the two bullet fragments recovered by Det. Ciiritella from in front of April Gardner's house had been fired from the same gun as that used to kill the victims was improper and unsupported by expert testimony.[24]

<u>Supplemental Claim Three</u>: The Court abused its discretion and deprived defendant of the right to adequately cross-examine the State's expert witness following a jury view of the actual vehicle in which the victims were killed.[25]

## Legal Standard

To prevail on an ineffective assistance of counsel claim, a defendant must meet the two-pronged *Strickland* test by showing that: (1) counsel performed at a level "below an objective standard of reasonableness" and that, (2) the deficient performance prejudiced the defense.[26] The first prong requires the defendant to show by a preponderance of the evidence that defense counsel was not reasonably competent, while the second prong requires the defendant to show that there is a

---

[22] *Id.* 7.

[23] D.I. 139 at (1).

[24] *Id.* (4).

[25] *Id.* ***(1)***.

[26] *Strickland v. Washington*, 466 U.S. 668, 687-88, 694 (1984).

reasonable probability that, but for defense counsel's unprofessional errors, the outcome of the proceedings would have been different.[27]

When a court examines a claim of ineffective assistance of counsel, it may address either prong first; where one prong is not met, the claim may be rejected without contemplating the other prong.[28] Mere allegations of ineffectiveness will not suffice; instead, a defendant must make and substantiate concrete allegations of actual prejudice.[29] An error by defense counsel, even if professionally unreasonable, does not warrant setting aside the judgment of conviction if the error had no effect on the judgment.[30] Before a court will reverse a conviction for ineffective assistance of counsel, the petitioner must prove that the likelihood of a different result, but for trial counsel's errors, is substantial and not just conceivable.[31]

In considering post-trial attacks on counsel, *Strickland* cautions that trial counsel's performance should be reviewed from his or her perspective at the time decisions were being made.[32] A fair assessment of attorney performance requires

---

[27] *Id.*

[28] *Id.* at 697.

[29] *Younger v. State*, 580 A.2d 552, 556 (Del. 1990).

[30] *Strickland*, 466 U.S. at 691.

[31] *Neal v. State*, 80 A.3d 935, 942 (Del. 2013) (internal quotations and citations omitted).

[32] *Id.*

11

that every effort be made to eliminate the distorting efforts of hindsight. Second guessing or "Monday morning quarterbacking" should be avoided.[33]

The procedural requirements of Superior Court Criminal Rule 61 must be addressed before considering the merits of any argument.[34] Although Washington's original Motion was timely filed, aspects of his claims are procedurally barred under Rule 61(i)(1) - (4).[35] I will address the procedural bars and merits of each of Washington's claims in seriatim.

## Ground One

Washington claims that he received ineffective assistance of counsel because trial counsel failed to file motions to suppress the statements of Isaiah Fields and William Coleman. Washington claims that Fields' statement was inadmissible pursuant to D.R.E. 403 and 404(b)(3) and (4). Washington also claims that both Coleman and Field's statements were inadmissible pursuant to 11 *Del. C.* § 3507.

At the outset, I note that neither Fields nor Coleman's statements were introduced pursuant to 11 *Del. C.* § 3507. The only testimony the State offered thru Fields and Coleman was live, in-court testimony.

---

[33] *Id.*

[34] *See Younger*, 580 A.2d at 554.

[35] Washington's claims will be evaluated under Super. Ct. Crim. Rule 61 as it existed on the date his Motion was first filed.

Washington's complaint regarding Field's statement centers on testimony that while Fields was with Washington in June or July of 2008, at 930 Spruce Street, he observed Washington with a Mac-10 handgun. Fields testified that while Washington was "playing with [the gun] it went off" and that the police might find bullet holes in the wall.[36] Fields had shared this information with Det. Ciritella who then located patched-up bullet holes in the floor and wall as predicted by Fields. Washington's argument that this statement is inadmissible is wholly meritless. First, the statement is highly relevant as it ties Washington to a weapon capable of quickly firing 30 rounds—a candidate murder weapon. The fact that the evidence is prejudicial does not make it inadmissible. Rule 403 only requires exclusion of evidence if the "probative value is substantially outweighed by the danger of unfair prejudice." It is understandable that Washington views this evidence as prejudicially, for it clearly is. However, based on the facts of the case, it is not *unfairly* prejudicial.

Washington next argues that "Fields' statement was to prove one thing and one thing only, and that was to prove the character of the defendant strictly against the letter and spirit of D.R.E. 404(b)."[37] This argument is also meritless. The jury was not aware, until he testified at least, that Washington had a criminal record or

---

[36] Trial T. 10/7/2010 at 177.

[37] D.I. 77 at 1 – 2.

might be a person prohibited from owning or possessing a firearm. Therefore, the fact that Washington had possessed a firearm or that it accidently "went off" was not in and of itself, a "bad act." Additionally, the evidence was not offered for an improper purpose, such as to show Washington's general criminal disposition—it was offered to show that he had been in possession of the same weapon later used to kill the two victims. Finally, because the evidence does not rise to the level of a "bad act," the trial court was not required to conduct a 404(b) balancing test prior to allowing it into evidence.[38]

Trial Counsel had no meritorious basis upon which to object to this portion of Fields' or Waterman's testimony. My review of the trial transcripts reveals that Trial Counsel conducted a thorough and vigorous cross-examination of all the State's witnesses. In fact, Trial Counsel went so far as to *voir dire* Coleman outside the presence of the jury to ensure that nothing he was going to testify to was hearsay.[39] Trial Counsel was not deficient for failing to object or move to suppress Fields' or Coleman's statements—there was no basis to do so.

### Ground Two

Washington argues that the State committed misconduct by "manipulation of facts and misleading the jury as to the conditions of Christopher Waterman's

---

[38] *See Getz v. State*, 538 A.2d 726 (Del. 1988).

[39] Trial T. 10/27/2010 at 71.

14

federal plea." In support his argument, Washington: (1) quotes a portion of the prosecutor's summation regarding Waterman's plea agreement, (2) notes that the State never produced the plea agreement itself, and (3) states that the plea agreement was not signed by Waterman.[40] In summary fashion, Washington also claims that the "exact nature of the plea" was not disclosed.[41]

A reading of Waterman and Det. Ciritella's testimony makes abundantly clear the facts of the plea agreement and Waterman's motive to testify—he wanted a deal for the information he had. Trial Counsel explored his plea agreement, cooperation, possible sentence and motivation to testify in great detail. It would have been clear to everyone in the courtroom that Waterman was not there as a "good Samaritan"—he was there only to help himself. The fact that the State did not introduce Waterman's plea agreement into evidence is of no import—the defense did as part of Waterman's cross-examination.[42] Additionally, my review of the plea agreement entered into evidence by Trial Counsel reveals that it was in fact signed by Waterman and all other parties.[43] Nothing the prosecutor said during her summation was in any way a manipulation or mischaracterization of the evidence regarding the plea agreement. The Prosecutor merely highlighted the fact

---

[40] D.I. 77 at 4.

[41] *Id.* 5.

[42] Defense Exhibit 1.

[43] *Id.*

15

that Waterman was not given any type of specific promise or deal for his testimony. Rather, she acknowledged that he could avoid a substantial amount of jail time by cooperating and that he was required to testify truthfully.[44] Waterman's credibility was front and center for the jury to decide.

Because Washington could have raised this issue on his direct appeal, but did not, it is procedurally barred under Rule 61(i)(3). Furthermore, Washington has not shown cause for this procedural default, nor has he shown any prejudice. This claim is meritless and should be denied.

### Ground Three

Washington argues that the State committed plain error, denying him the right to a fair trial, by manipulating trial evidence and vouching for the State's witnesses. Washington appears to argue that the Prosecutor made factual assertions in her opening statement that were not supported by the evidence, nor proven at trial. Washington does not point to any specific statements in his Motion; rather, he summarizes the State's opening statement in outline form. As best I can tell, Washington is claiming that the State committed error by arguing to the jury that the murders where the result of a robbery gone wrong and that the victims were killed intentionally.

---

[44] Trial T. 11/9/2010 at 152.

16

Based upon my review of the State's opening statement, I am satisfied that the State's theory of the case, and what it argued to the jury, was reasonable based on the evidence the State introduce. Admittedly, evidence was adduced during trial that contradicted the State's theory (i.e. the Mac-10 accidently discharged). Nevertheless, a prosecutor is allowed to present and argue all reasonable inferences that flow from the evidence.[45] In this case, the evidence reasonably supported the theory of an inchoate robbery or drug deal, interrupted by two intentional murders. The fact that the jury ultimately rejected the State's theory of robbery and intentional murder does not make the State's opening statement misleading or unfair. Rather, it shows that the jury carefully considered all the evidence and had a reasonable doubt as to aspects of the State's case. Therefore, this claim is without merit and it is also procedurally barred under Rule 61(i)(3) because it was not raised on direct appeal.

## Ground Four

Washington argues that the trial court committed plan error by allowing Det. Ciritella to testify as an expert on the State's forensics. While it is true that Det. Ciritella summarized some of the forensic evidence during his initial testimony,[46] it did not prejudice Washington. The State properly introduced all forensic evidence

---

[45] See *Daniels v. State*, 859 A.2d 1008, 1011 (Del. 2004) (quoting *Hooks v. State*, 416 A.2d 189, 204 (Del. 1980)); *see also Boatson v. State*, 457 A.2d 738, 742 (Del. 1983).

[46] Trial T. 10/26/2010 at 101.

through the appropriate expert witnesses later in the trial. Trial Counsel also made a timely objection to Det. Ciritella's testimony, which was sustained by the Court.[47] This claim is without merit. Additionally, because Washington could have raised this claim on his direct appeal, but did not, it is procedurally barred under Rule 61(i)(3).

## Supplemental Claim One

Washington next argues that the State improperly interjected into the trial information regarding where the shooter was seated in the vehicle and that this statement was not factually supported by the testimony of the State's ballistic expert, Carl Rone. More specifically, Washington is disputing the Prosecutors comment in her summation that Rone testified that anyone who was seated in the rear driver's side passenger seat "would have been shot."[48] Washington argues that under *Hughes v. State*,[49] the prosecutors' unsupported and misleading comment prejudiced his case and amounted to a deprivation of his rights. As noted by Washington, this comment was not objected to by Trial Counsel.

I view Washington's argument as an amalgam of prosecutorial misconduct and a failure of his trial counsel to object. As cited by Washington, the *Hughes* test is inapplicable as it only applies "once a prosecutor's comment or act is

---

[47] *Id.*
[48] Trial T. 11/9/2010 at 63.

[49] 437 A.2d 559 (Del. 1981).

18

deemed improper."[50] No matter how Washington's claim is couched, it should be denied as procedurally barred under Rule 61(i)(3), and meritless.

The evidence in this case showed that 30 rounds of 9mm ammunition were discharged, most likely in fully automatic mode, from the back seat of the vehicle. The interior of the passenger compartment was literally riddled with bullet holes and the passenger side windows were shot out. Logic dictates that since the front two seats of the car were occupied by the deceased victims, who had both been shot from behind, and all the firing came from inside the car, the shooter must have been seated in the backseat. In fact, Rone testified to this very point, stating that the shooter was seated on the rear passenger side.[51]

Gardner testified that prior to the shooting she observed a car parked in front of her house and "[there] was a guy in the driver's seat."[52] Gardener testified that she observed Washington and an unknown man approach the car. She observed the unknown man enter the front passenger seat while Washignton waited nearby. Gardner then testified that the unknown person exited the car, approached Washington, and that after a brief conversation, Washington "got in the back seat

---

[50] *Gregory v. State*, 2011 WL 4985654, *4 (Del. October 19, 2011).

[51] Trial T. 11/1/2010 at 61.

[52] Trial T. 10/27/2010 at 127.

19

of the car while the [unknown] guy got in the passenger side."[53] Although Gardner did not explicitly state that it was the rear *passenger* side, it is a reasonable inference in light of her testimony and vantage point at the time.

The Prosecutor's argument that a person seated on the driver's side passenger seat "would have been shot" was not an unreasonable extrapolation from the ballistic evidence. The simple fact is, all of the evidence indicates that the shooter was on the rear passenger side of the car. The fact that the Prosecutor attributed this statement to Rone, albeit inaccurately as far as I can tell, does not appear to have prejudiced Washington in any way. My review of the photos of the interior of the car reveals that three bullets passed through the rear passenger seat cushion on the driver's side.[54] It is obvious based on the trajectory rods visible in the photo that anyone seated on that side would have been struck by the bullets. Accordingly, Trial Counsel's failure to object to the prosecutor's comment was not unreasonable and did not prejudice Washington.

### Supplemental Claim Two

Washington argues that the State committed prosecutorial misconduct when it improperly argued to the jury that the two copper bullet fragments recovered by Det. Ciritella were fired from the same gun used to kill Guy and Leighton.

---

[53] *Id.* 128.

[54] State's Exhibit 21 (picture).

20

Washington argues that this statement was improper because "do [sic] to the fact that expert Rone never confirmed that the [two] copper fragments [were] fired from the same weapon amounted to a testimony of an [unsworn] witness."[55] Washington also cites to the Delaware Supreme Court decision in his appeal as support for his claim. In its decision, the Supreme Court noted that "[i]t does not appear that Rone testified about bullet fragments that were recovered from the 700 block of E. 10th Street."[56]

After carefully reviewing the trial transcripts and the actual evidence submitted in this case, I have concluded that Washington's assertion is incorrect. The two bullets recovered by Det. Ciritella from the 700 block of E 10th Street were tested by Rone against the bullets and fragments recovered from the victim's bodies and the house at 930 Spruce Street. Washington's misapprehension lies in the fact that Rone's report does not delineate the specific location each item was recovered from. Rather, Rone's report merely indicates that he tested a total of 30 cartridge casing, 11 bullets and eight bullet fragments.

I have reviewed the physical evidence entered at trial and it matches Rone's report. State's Exhibit 98 contains eight bullets and 11 bullet fragments. The evidence collection bags indicate that State's Exhibit 98R and 98S are the two

---

[55] D.I. 140 at (5).

[56] *Washington*, 2011 WL 4908250, at *4.

21

bullets recovered from the "700 BLK of E 10th St." on "9/2/2010"—near where April Gardner was seated. The back of the evidence collection bags for State's Exhibit 98R and 98S are both labeled "Lab # 080591," which is Rone's report of April 8, 2010. The three bullets recovered from 930 Spruce St. were entered into evidence as State's Exhibit 99, and are listed separately in Rone's report dated March 25, 2010.

At trial, Rone testified that "[a]ll of the bullets were fired from the same firearm, all the casings were fired from the same firearm."[57] Rone's use of the term "all" is admittedly not as precise as it could have been, but upon review of the physical evidence and his report, it is clear that by his testimony he was describing all 19 bullets and fragments from all three locations. However, Rone does admit that he cannot say, based on the ballistic comparison he conducted, that the same gun fired the bullets *and* shell casings because he does not have a firearm to compare both specimens against.[58] Nevertheless, based on the physical evidence and Rone's testimony, the two bullets fragments recovered by Det. Ciritella from 700 block of E 10th street, were tested, and that testing indicated that they were fired from the same gun as the bullets removed from the victim's bodies and the bullets recovered from 930 Spruce St. Accordingly, Washington's claim is without

---

[57] Trial T. 11/1/2010 at 113.

[58] *Id.*

merit. Washington's claim is also procedurally barred under Rule 61(i)(4) because it was raised on his direct appeal.

## Supplemental Claim Three

During trial, the jury was escorted down to the courthouse sally port for a view of the actual vehicle where the victims were found dead. During the jury view Washington was seated nearby in a DOC van. After the jury view, Washington complained to the Judge that he could not see the vehicle from the DOC van where he had been seated.[59] The Judge then instructed the State to have the car brought back over to the courthouse so Washington could view it; which he did.

However, Washington takes issue with the jury view. After he was given a chance to view the vehicle, Washington argues that "there was several questions [I] wanted to ask expert witness Mr. Rone during cross examination but was denied the right because Mr. Rone was dismiss[ed] and [the] [S]tate rested."[60]

First, I note that the fact that the State rested its case before Washington had an opportunity to view the car is irrelevant. If they felt it necessary, Trial Counsel could have called Rone as a witness in its case to ask any additional or follow-up questions.

---

[59] Trial T. 11/1/2010 at 129-130.

[60] *Id.* Pg(2).

23

Washington states that he wanted the following questions asked: (1) "[t]he vehicle was clean[ed] out and the driver and passenger seat[s] was move[ed] up and down and back and forth prior to insertion of the trajectory rods[,] will that effect the opinion on where the shooting may have took place," and (2) "[c]onsidering all the impact rounds discovered within the vehicle what is the opinion on the possible people that could have been seated inside during the shooting." Washington states "these are (2) of the many questions he wanted to ask Mr. Rone on cross examination once he view[ed] the vehicle."

No matter if couched as prosecutorial misconduct or an abuse of discretion by the trial court, Washington's claims must fail because they are procedurally barred under Rule 61(i)(3). Washington could have raised this claim previously, but did not.

Under the banner of ineffective assistance of counsel, Washington's claim fails because he has not shown that Trial Counsel's performance was deficient in any way. Nor has Washington shown that the outcome of the trial would have been different had these specific questions been asked—*by anyone*. Trial Counsel is vested with wide latitude in conducting cross examination and deciding what questions to ask, or not ask.[61] My review of the trial transcripts reveals that Rone was subjected to a lengthy and vigorous cross examination. Washington's first

---

[61] *State v. Powell*, 2016 WL 3023740 at *11 (Del. Super. May 24, 2016)

question is based on the premise that the seats in the car were moved *prior* to insertion of the trajectory rods, an assertion I can find no support for anywhere in the record. Washington's second question was actually answered by Rone. Rone testified that the shooter was seated in the rear passenger side seat based on the trajectory of the bullets.

## Conclusion

For the foregoing reasons, Washington's Amended Motion and Supplemental Claims for postconviction relief should all be DENIED. Rule 61 Counsel's Motion to Withdraw should be GRANTED.

**IT IS SO RECOMMENDED.**

/s/ *Bradley V. Manning*
BRADLEY V. MANNING,
Commissioner

oc:   Prothonotary
cc:   Defendant via first class mail.
      All counsel via email.

25