IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JASON C. POWELL, ESQ., | : | |
| as personal representative of the | : | |
| ESTATE OF MARK KRIEGER, | : | |
| | : | |
| Plaintiff, | : | C.A. No. K17C-11-003 JJC |
| | : | In and for Kent County |
| v. | : | |
| | : | |
| AMGUARD INSURANCE | : | |
| COMPANY, | : | |
| | : | |
| Defendant. | : | |

## OPINION

Submitted: December 4, 2019
Decided: March 2, 2020

*Defendant's Motion for Judgment as a Matter of Law – DENIED*
*Defendant's Motion for a New Trial – GRANTED*

John S. Spadaro, Esquire, John Sheehan Spadaro, LLC, Smyrna, Delaware, *Attorney for Plaintiff*.

Thaddeus J. Weaver, Esquire, Dilworth Paxson, LLP, Wilmington, Delaware, John D. Balaguer, Esquire, White & Williams, LLP, Wilmington, Delaware, & Edward M. Koch, Esquire, White & Williams, LLP, Philadelphia, Pennsylvania, *Attorneys for Defendant*.

**Clark, J.**

Plaintiff Jason C. Powell, as personal representative of the Estate of Mark Krieger, ("the Estate") prevailed in a bad faith insurance action against Defendant AmGuard Insurance Company ("AmGuard"). The jury found that AmGuard unreasonably delayed paying Mr. Krieger's workers' compensation wage benefits for seventy-two days.[1] It awarded the Estate $500,000 in punitive damages. After trial, by stipulation of the parties, the Court entered judgment for compensatory damages in the amount of $28.22.

AmGuard now moves for (1) judgment as a matter of law, (2) a new trial, or (2) in the alternative, remittitur. Because AmGuard did not renew its motion for judgment as a matter of law at the close of all the evidence, its post-trial motion for judgment as a matter of law is procedurally barred.

With regard to its motion for a new trial, however, the jury's punitive damages award of $500,000 shocks the Court's conscience. For that reason, a new trial is necessary. In this case, the Estate's summation, made without evidentiary support, likely inflamed the jury. As a result, the verdict was likely the product of passion or prejudice. Because the Court cannot fairly conclude that the jury's decision regarding liability was not also affected by this passion or prejudice, a new trial regarding both liability and damages is necessary.

## I.    Procedural Background and Trial Evidence

The evidence recited herein is the evidence presented during a five day jury trial in October 2019. It is viewed in the light most favorable to the Estate.

Mr. Krieger suffered a work injury on May 22, 2017. On June 5, 2017, AmGuard received the claim. That same day, AmGuard wrote Mr. Krieger and told

---

[1] *See* Def. AmGuard's Motion for Judgment as a Matter of Law, Ex. 1 (answer through Special Verdict Form, by the jury, that AmGuard should have started paying workers' compensation benefits to Mr. Krieger on July 22, 2017, and that its unreasonable delay in payment ended on October 2, 2017).

2

him that it could not accept or deny his claim because of a "lack of medical documentation." It further wrote that it hoped to complete its investigation within thirty days. On June 6, 2017, an AmGuard adjuster spoke with a representative of Mr. Krieger's employer, Hero Demolition. The Hero Demolition representative told the adjuster that Mr. Krieger was at the job site early on the day of his injury. He also alleged that Mr. Krieger intended to steal the company's copper.

On June 12, 2017, Mr. Krieger underwent an MRI. The MRI report referenced nine separate bone fractures in his foot and ankle. AmGuard received that report on July 7, 2017. AmGuard had already received Mr. Krieger's emergency room records. Notwithstanding the records and report, AmGuard did not accept Mr. Krieger's claim. Instead, it delayed its decision because of alleged "red flags" regarding (1) Mr. Krieger's possible drug use, and (2) Hero Demolition's theft allegation. AmGuard took no action to investigate either "red flag" between June 6th and July 7th, when it received the MRI report. AmGuard conceded that by no later than July 12, 2017, it was aware that Mr. Krieger had suffered multiple fractures in his foot and ankle.

One month after receiving Mr. Krieger's MRI results, as of August 8, 2017, AmGuard still had taken no action to investigate these alleged "red flags" and had not paid Mr. Krieger's lost wages. On that day, AmGuard first told Mr. Krieger's attorney that it was withholding his benefits because of a new allegation—that Mr. Krieger did not have permission to drive the forklift that injured him. Delaying payment of *no-fault* workers' compensation benefits because the claimant was allegedly at fault for his injury was strong evidence of unjustified delay.

Once AmGuard notified Mr. Krieger's attorney of this new red flag (that AmGuard had taken no action itself to investigate), Mr. Krieger's attorney interviewed Hero Demolition's employees. After doing so, Mr. Krieger's attorney relayed the information to AmGuard. At that point, in late August, for the first time,

3

AmGuard investigated Hero Demolition's claims. When doing so, it easily confirmed that the employer falsely claimed that Mr. Krieger impermissibly used the forklift and had attempted theft.

Delay in payment of wages continued, however. For an additional month, AmGuard contested the severity of Mr. Krieger's disability and whether AmGuard should pay an attorneys' fee. On October 2, 2017, four days before the scheduled IAB hearing on October 6, 2017, the parties settled the lost wage issue. By that point, Mr. Krieger had received no income for four months. Despite AmGuard's statutory obligation to notify Mr. Krieger in writing of its reasons for delaying payment, it never provided him with an accurate written explanation.[2] It issued its first check to Mr. Krieger for lost wage benefits on October 2, 2017. Thereafter, it continued to pay them until Mr. Krieger died from unrelated causes in 2018. Prior to Mr. Krieger's death, he sued AmGuard for bad faith delay in investigation and payment.

Following Mr. Krieger's death, his counsel retained Jason Powell, Esquire, to open an estate. Upon motion by Mr. Krieger's counsel, the Court permitted Mr. Powell, as the Estate's personal representative, to be substituted as the plaintiff. Mr. Krieger died shortly after he filed suit. As a result, he did not testify in a deposition or participate in formulating discovery responses. As a result, the Estate presented no evidence at trial regarding the delay's impact on Mr. Krieger. In fact, the only evidence permitting even an inference of harm came from AmGuard's corporate designee, Edward G. Hennrikus. Namely, Mr. Hennrikus conceded (1) that a forklift operator would not be expected to be affluent, and (2) that AmGuard knew that

---

[2] *See* 19 *Del. C*. § 2362(a) (providing that "an employer or its insurance carrier shall within 15 days after receipt . . . notify . . . the claimant in writing . . . whether the claim is accepted or denied [and] if it cannot accept or deny the claim, the reasons therefor and approximately when a determination will be made"). There was no dispute at trial that AmGuard violated this statutory mandate.

4

withholding Mr. Krieger's wage replacement benefits for four months caused him financial distress.[3]

There were three relevant procedural events at trial. First, following the Estate's case-in-chief, AmGuard moved for judgment as a matter of law. It did so regarding the issues of (1) bad faith and (2) punitive damages stemming from AmGuard's allegedly reckless disregard of Mr. Krieger's rights.[4] It argued that the Estate's evidence supported only that AmGuard handled the claim in an "imperfect but not an untimely manner."[5] In response, the Estate emphasized that a mere suspicion of an insured's misconduct, without an investigation, was insufficient to withhold insurance coverage.

The Court denied AmGuard's motion for judgment as a matter of law. It explained that a party's state of mind may be inferred from the circumstances. The evidence viewed in the light most favorable to the Estate provided a sufficient basis for a reasonable jury to find that AmGuard (1) delayed Mr. Krieger's wage payments without reasonable justification and (2) did so with reckless indifference to his rights as an insured.[6] The trial evidence closely tracked the record evidence presented during AmGuard's earlier summary judgment motion. Accordingly, the Court incorporated its summary judgment decision's reasoning into its oral denial of AmGuard's motion.[7]

Second, following the defense portion of the case and at the close of all the evidence, the Estate—but not AmGuard—moved for judgment as a matter of law.[8]

---

[3] Pl. Answering Br. to Def. Mot. for Remittitur, Ex. B, at 113:8–17.

[4] Trial Transcript, Vol. C, at C14:5–C21:5.

[5] *Id.* at C14:14.

[6] *Id.* at C21:18–C22:16.

[7] *See Powell v. AmGuard Ins. Co.*, 2019 WL 4509165, at *4–5 (Del. Super. Sept. 19, 2019) (examining the circumstances and conduct of AmGuard on the summary judgment record, and explaining that claims of bad faith and punitive damages include highly factual state of mind considerations, making summary judgment inappropriate on that record).

[8] Trial Transcript, Vol. D, at D107:17–D110:21.

The Estate argued that AmGuard unjustifiably delayed payment because it had only a mere suspicion, and not a reasonable basis, to withhold payment.[9] In response, AmGuard argued that it reasonably investigated the employer's accusation and still resolved the claim in less than average time.[10]

The Court denied the Estate's motion. It held that the trial evidence could support a reasonable jury's finding that AmGuard did not act in bad faith for the following reasons: (1) AmGuard paid Mr. Krieger benefits before an IAB hearing; (2) Hero Demolition provided AmGuard a report that Mr. Krieger was outside the scope of his employment when injured; and (3) AmGuard's expert testified that AmGuard settled the claim more quickly than the average claim.[11] Again, AmGuard did not renew its motion for judgment as a matter of law at the close of all the evidence.

Third, and finally, counsel for the Estate made several objectionable and inflammatory arguments during his closing. The evidence did not support many of his arguments. Nevertheless, AmGuard did not object to them. Rather, it first raised this issue in its post-trial motion for judgment as a matter of law.

These objectionable statements included that: (1) AmGuard stole from Mr. Krieger;[12] (2) it used "dirty lies" and "strategies;"[13] (3) it used "filthy business practices;"[14] (4) AmGuard "lights their cigars with [the amount of] money [at issue here;]"and (5) it had a "filthy devotion to money, which they elevate over human life and human safety and human welfare."[15] The Estate's counsel also referenced

---

[9] *Id.* at D108:2–D108:20.

[10] *Id.* at D111:1–D114:6.

[11] *Id.* at D114:10–D118:1.

[12] Trial Transcript, Vol. E, at E18:19–20 (stating that AmGuard "stole from Mark Krieger. They stole from him a fair chance to show them [that the suspicions and allegations were false]"). *See also id.* at E19:14–16; E19:22–E20:5.

[13] *Id.* at E20:4–E21:17.

[14] *Id.* at E28:20–21.

[15] *Id.* at E28:21–22.

harm to Mr. Krieger that the evidence did not support. Those statements included claiming Mr. Krieger's "financial ruin" and that his "lights [were] about to be turned off."[16] Counsel then described the expected results of an insurance company's bad faith, including eviction, foreclosure, credit card debt, hunger, asset repossession, and homelessness.[17]

He urged the jury to consider the effects of AmGuard's conduct on the community. He also asked the jury to place itself in Mr. Krieger's position as a forklift driver with no income.[18] He did that by intimating that anyone could find themselves in Mr. Krieger's position, such as a juror's friend, neighbor, child, or parent.[19] At one point, he cautioned the jury that they were surrounded by abusive corporations and promised them more power in rendering their verdict than they would ever again have in their lives. Once more, at no point during or after these arguments, did AmGuard object. Nor did it request a curative instruction or move for a mistrial.

The jury returned a verdict for the Estate. It found that AmGuard unreasonably delayed paying wage benefits to Mr. Krieger from July 22, 2017 to October 2, 2017. It also awarded the Estate $500,000 in punitive damages. *In limine*, the Court held that compensatory damages would be capped at the interest due on any unjustified delay in paying the $7,300 of withheld benefits. Post-trial, the parties stipulated that those compensatory damages totaled $28.22. The Court then entered judgment for the Estate in the amount of $500,028.22.

---

[16] *Id.* at E31:21–23.
[17] *Id.* at E40:5–15.
[18] *Id.* at E39:17–21.
[19] *Id.* at E39:23–E40:2.

## II.    AmGuard's motion for judgment as a matter of law is procedurally barred.

Superior Court Civil Rule 50 precludes AmGuard from renewing its motion for judgment as a matter of law.  Rule 50(b) provides that "[w]henever a motion for judgment as a matter of law made *at the close of all the evidence* is denied or for any reason is not granted . . . [s]uch a motion may be renewed by service and filing not later than 10 days after entry of judgment."[20]  AmGuard did not move for judgment as a matter of law at the close of all the evidence.  Rather, it did so only at the close of the Estate's case-in-chief.  There, the Court denied the motion and incorporated the reasoning from its summary judgment decision.[21]  By failing to renew its motion at *the close of all the evidence*, AmGuard did not meet a condition precedent to renew its motion for judgment as a matter of law.[22]  Accordingly, the motion must be denied.

## III.    The punitive damages award shocks the conscience of the Court; a new trial is necessary.

### A. New Trial Standard

---

[20] Sup. Ct. Civ. R. 50(b) (emphasis added).

[21] *See Powell*, 2019 WL 4509165, at *4–5.

[22] *See William H. Porter, Inc. v. Edwards*, 616 A.2d 838 (Del. 1992) (explaining that because the defendant failed to renew its earlier motion for a directed verdict at the close of all the evidence, it lacked standing to move for judgment notwithstanding the verdict).  The language "at the close of all the evidence," which the Delaware Supreme Court based the *Porter* decision upon, survived the changes in Superior Court Rule 50 that redesignated directed verdicts as judgments as a matter of law.  *See also Pabon v. Geico Corp.*, 2017 WL 3635569, at *1–2 (Del. Super. Aug. 23, 2017) (denying the plaintiffs' motion for judgment as a matter of law where they made the motion at the close of their case, but failed to renew it at the close of all the evidence); *Samson v. Somerville*, 2005 WL 1953054, at *1 (Del. Super. July 26, 2005) (finding the plaintiff's motion for judgment as a matter of law to be precluded by Rule 50(b) because the plaintiff failed to so move at the close of all the evidence).

Under Delaware law, jury verdicts are given enormous deference.[23]  Courts defer to juries' decisions and "in the absence of exceptional circumstances, the validity of damages determined by the jury should . . . be presumed."[24]  It is also well recognized that "[a] verdict will not be disturbed as excessive unless . . . it was the result of passion, prejudice, partiality or corruption; or that it was manifestly the result of disregard of the evidence or applicable rules of law."[25]  In this regard, "[a damages] verdict should not be set aside unless it is so grossly excessive as to shock the Court's conscience and sense of justice, and the injustice of allowing the verdict to stand is clear."[26]

## B. Analysis

AmGuard moves for a new trial on three bases: (1) the Court mistakenly decided two evidentiary issues; (2) notwithstanding AmGuard's lack of objection, the Estate's closing argument was so improper that a new trial is required; and (3) the jury's punitive damages verdict was so disproportionate to compensatory damages that it was against the great weight of the evidence.  The third basis requires a new trial.

1. **Admitting evidence that AmGuard issued a statutorily deficient notice in another case for the limited purpose of proving AmGuard's state of mind was not error; nor was admitting AmGuard attorney's advertising because that advertising was known to AmGuard before it hired him.**

AmGuard first argues that the Court erroneously admitted an AmGuard corporate designee's prior deposition testimony taken in another bad faith insurance

---

[23] *Young v. Frase*, 702 A.2d 1234, 1236 (Del. 1997).
[24] *Id.*
[25] *Storey v. Castner*, 314 A.2d 187, 193 (Del. 1973) (citation omitted).
[26] *Id.*

9

suit. It objected based on relevance and DRE 403 concerns. Second, AmGuard argues that the Court erred when admitting an advertising mission statement posted by its workers' compensation defense attorney. It objected to that evidence on relevance and DRE 403 concerns as well. The alleged errors, it argues, caused sufficient unfair prejudice to require a new trial.

With regard to the first issue, the Court admitted prior testimony taken in the Rule 30(b)(6) deposition of Edward Hennrikus. That testimony addressed AmGuard's conduct in a prior bad faith action. In the prior case, as in the case at hand, AmGuard failed to provide the proper reason for its delay in accepting the insured's claim.[27] When admitting this evidence, the Court imposed significant limitations to mitigate prejudice.[28] Namely, the Court ruled admissible only that testimony related to AmGuard's written justification for withholding benefits in the prior case. Furthermore, the grounds for admission were limited to the purposes of demonstrating AmGuard's state of mind. In this bad faith/punitive damages context, this included recidivism and absence of mistake. A punitive damages claim includes a broadened relevance of recidivism. In addition, this evidence made it more probable that AmGuard's actions in the present case were other than accidental.

Although AmGuard did not object to this evidence as being inadmissible character evidence, the Court nevertheless held an *in limine* hearing on the record pursuant to *Getz v. State*.[29] As far as DRE 404(b) is concerned, the *Getz* criteria apply in civil cases as they do in criminal cases.[30] The Court addressed each of the

---

[27] Sept. 30, 2019 Civil Motions Hearing Transcript, at 90:22–91:4.

[28] *See id.*, at 89–92 (providing the Court's ruling on AmGuard's motion *in limine* seeking to bar evidence from prior litigation). *See also* Pl. Trial Ex. 22 (Excerpted Video Testimony) (providing AmGuard's 30(b)(6) deposition testimony in the matter of *Benson v. AmGuard Insurance Company*).

[29] 538 A.2d 726 (Del. 1988).

[30] *Mercedes-Benz of N. Am. Inc. v. Norman Gershman's Things to Wear, Inc.*, 596 A.2d 1358, 1365 (Del. 1991).

*Getz* criteria and found this prior bad act evidence to be admissible for limited purposes. At the same time, the Court held other proffered prior bad act testimony to be inadmissible. To mitigate prejudice, the Court offered AmGuard the option to request a limiting instruction.[31] AmGuard did not request a contemporaneous limiting instruction.[32] Nor did it request one in the final jury instructions.

With regard to the other evidentiary issue, AmGuard hired Joseph Andrews, Esquire, to represent it and the employer's interests before the IAB. It had previously retained Mr. Andrews in other cases. At least nine months before AmGuard hired Mr. Andrews for Mr. Krieger's case, Mr. Hennrikus testified in a Rule 30(b)(6) deposition that AmGuard was aware of Mr. Andrews's internet advertising.[33] Mr. Hennrikus testified in the prior deposition that AmGuard did not approve of its tone.[34]

Mr. Andrews' mission statement, posted on-line during the prior case *and* at the time AmGuard hired him for Mr. Krieger's claim, read as follows:

> [this law office] concentrates on Delaware Workers' Compensation Defense throughout the entire State of Delaware; whether denying new claims, terminating open claims, investigating settlement, denying coverage, or taking proper legal action against those who defraud our clients. From the moment a claim is reported until brought to its proper conclusion, our overriding philosophy is to allow clients to close claims permanently in the most cost-effective way.[35]

The fact finder needed to assess AmGuard's state of mind in this bad faith action. That required the jury to assess AmGuard's motivation for allegedly delaying the investigation and payment of the claim.[36] In this regard, this statement had relevance

---

[31] Oct. 11, 2019 Office Conference Transcript, at 58.

[32] *See* Trial Transcript, Vol. B, at B208 (renewing and preserving previous objections to the *Benson* testimony, but not requesting any curative or limiting instruction in regard thereto).

[33] Pl. Trial Ex. 22 (Excerpted Video Testimony), at 107:3–17.

[34] *Id.* at 107:18–108:1.

[35] Pl. Trial Ex. 10, at 1.

[36] Oct. 11, 2019 Office Conference Transcript, at 33.

for the limited purpose of assessing AmGuard's state of mind.[37] Namely, it made it more probable that AmGuard was pre-disposed to deny Mr. Krieger's claim. In that way, it supported an inference that AmGuard possessed a state of mind that more likely included bad faith and recklessness.[38]

When addressing the issue *in limine*, the Court performed a DRE 403 analysis and found its relevance to not be substantially outweighed by DRE 403 concerns. Since the Court admitted it for a limited purpose, it offered AmGuard the option to request a limiting instruction.[39] AmGuard proposed one in the parties' jointly submitted jury instructions.[40] The Court accepted it *as proposed* by AmGuard and read it. The instruction provided as follows:

### Attorney Advertising Was Not AmGuard's Advertising

You have heard and seen certain information from the website of attorney Joseph Andrews, who represented AmGuard Insurance Company, and Hero Demolition, in connection with Mr. Krieger's claim for workers' compensation benefits. That information is Mr. Andrews' advertising; it is not AmGuard's advertising.[41]

AmGuard's requested instruction did not address the limited purpose for which the evidence was offered. AmGuard apparently opted to not request that language for tactical reasons. Nevertheless, this instruction, given in the form requested by AmGuard, resolved any issue of *unfair* prejudice.

Finally, at no time during trial did AmGuard accept the Court's invitation for a contemporaneous instruction regarding the advertising.[42] Trial decisions regarding the helpfulness of contemporaneous limiting instructions in a civil case fall within

---

[37] *Id.*

[38] *Id.* at 33:6–11.

[39] *Id.* at 34:11–20.

[40] Joint Proposed Instructions, at 8.

[41] Trial Transcript, Vol. E, at E110–11.

[42] Trial Transcript, Vol. B, at B208.

12

the purview of the attorney trying the case. The Court properly admitted the evidence for its limited purpose. At that point, the jury was free to assign it the weight it felt it was due regarding AmGuard's state of mind.

**2. AmGuard waived its ability to seek a new trial based upon the Estate's closing argument because it did not object, request a curative instruction, or move for a mistrial.**

AmGuard argues that the Estate's closing argument was unduly prejudicial because it included "intimidation, accusations . . ., wholly conjured scenes of economic ruin, improper personal comments and vouching concerning AmGuard's conduct, [and] . . . blatant Golden Rule violations[.]"[43] In response, the Estate argues that AmGuard waived any such challenge because it failed to object at trial. It also argues that counsel's shouting, isolated cursing, and what AmGuard alleges to have been religious invocations were not so prejudicial as to require a new trial.

At the outset, a party waives its right to raise these issues when it fails to object at trial.[44] AmGuard argues that it did not need to register an objection because the Court "contemporaneously addressed" a single matter in the Estate's closing. During an incident where the Estate's counsel used a curse word, the Court intervened, corrected him, and admonished him not to do it again.[45] The Court limited its correction to a particular aspect of appropriate trial decorum. It did not address any of the matters that AmGuard now challenges.

---

[43] Def. AmGuard's Motion for Judgment as a Matter of Law, at ¶ 13.
[44] *See Med. Ctr. of Delaware, Inc. v. Lougheed*, 661 A.2d 1055, 1060 (Del. 1995) (explaining that "[a] party must timely object to improper statements made during closing argument in order to give the trial court the opportunity to correct any error. We recognize that, for strategy reasons, counsel may choose not to object to a misstatement made in an opponent's closing remarks, but the failure to object generally constitutes waiver of the right subsequently to raise the issue"). *Contra Baker v. State*, 906 A.2d 139, 151 (Del. 2006) (emphasizing that in the *criminal context* "trial judges have a continuing duty to intervene *sua sponte*, even in the absence of defense counsel's objection, when a trial prosecutor steps out of bounds" during summation).
[45] Trial Transcript, Vol. E, at 41:1–8.

In further support, AmGuard makes three additional arguments. First, it argues that it was plain error for the Court to not grant a new trial because it should have intervened *sua sponte*. Second, AmGuard relies upon criminal case authority addressing prosecutorial misconduct in closing arguments. Third, AmGuard cites civil authority where the complaining party registered a contemporaneous objection, or requested a curative instruction immediately after the summation.

At the outset, AmGuard incorrectly charges this Court with plain error. Plain error is an appellate standard and has no place in a trial court's analysis.[46] Nevertheless, the Court understands that AmGuard's seeks to impose a post-facto burden upon the Court to have intervened *sua sponte*. This disregards that experienced attorneys, such as trial counsel in this case, often choose not to object for tactical reasons. Such reasons often include a decision to permit opposing counsel to overreach, which can impair an opponent's credibility with the jury. In fact, counsel for AmGuard took that approach. Much of AmGuard's closing argument focused on the lack of evidentiary support for opposing counsel's arguments and that he overreached by grossly exaggerating the Estate's claims. In hindsight, with this particular jury, the approach did not benefit AmGuard. Regardless, it was not the Court's responsibility to make a real time decision to intervene and countermand AmGuard's tactical decision to not object.

Second, AmGuard incorrectly relies upon criminal decisions that address prosecutorial arguments. In criminal cases, the Delaware Supreme Court has often held that the special role of prosecutors in our criminal justice system sometimes

---

[46] *See Capano v. State*, 781 A.2d 556, 663 (Del. 2001) (explaining that "[p]lain errors must be 'apparent on the face of the record.' As suggested by this language, the issue is whether the error is apparent from the vantage point of the *appellate court* in reviewing the trial record, not whether it was apparent to the *trial* court in light of then-existing law").

requires a trial judge to intervene absent a criminal defense attorney's objection.[47] The decisions that AmGuard relies upon, such as *Kirkley v. State*,[48] recognize that "trial judges have a continuing duty to intervene *sua sponte*, even in the absence of *defense counsel's* objection, when a *trial prosecutor* steps out of bounds."[49] Impermissible prosecutorial conduct includes improper vouching, where the prosecutor improperly suggests, insinuates, or asserts personal knowledge,[50] or where the prosecutor provides a personal opinion.[51] In those instances, if defense counsel fails to raise a timely objection and the trial judge does not intervene *sua sponte*, the appellate court reviews for plain error.[52]

This was a civil case, however. There was no prosecutor that "occupied a unique role in the adversary system . . . to seek justice, not merely convictions."[53] Criminal prosecutors have a dual role: to present the State's case earnestly *and* to advance justice by providing the defendant a fair and adequate trial.[54] In contrast, civil cases involve more equally positioned counsel and parties. AmGuard's argument is not supported by the criminal case authority it cites.

Third, the civil authority cited by AmGuard involved circumstances where the challenging party either objected to the argument or requested a timely curative

---

[47] *Trump v. State*, 753 A.2d 963, 970, n. 30 (Del. 2000) (citing *Holtzman v. State*, 718 A.2d 528, 1998 WL 666722, at *9 ¶ 23 (Del. 1998) (TABLE) (explaining in the criminal context that "the United States Supreme Court and this Court have previously said that the trial judge should act to control the conduct of the attorneys, and at times act *sua sponte* even without objection" and citing *United States v. Young,* 470 U.S. 1, 10 (1985)) and *Brokenbrough v. State,* 522 A.2d 851, 863 (Del. 1987) (observing that in the criminal decisions "*Hooks, Bailey,* and *Hughes,* we have held that the trial judge must control the conduct of the court's officers and the trial judge should act at times even without an objection")).

[48] 41 A.3d 372 (Del. 2012).

[49] *Baker*, 906 A.2d at 151.

[50] *Kirkley*, 41 A.3d at 377.

[51] *Holtzman*, 1998 WL 666722, at *9 (citing *Brokenbrough*, 522 A.2d at 861).

[52] *Baker*, 906 A.2d at 148 (citing *Kurzmann v. State,* 903 A.2d 702 (Del.2006)).

[53] *Trump*, 753 A.2d at 967 (quoting *Brokenbrough*, 522 A.2d at 855).

[54] *Id.*

instruction.  In support, AmGuard relies primarily upon two Delaware Supreme Court civil decisions:  *Deangelis v. Harrison*[55] and *Delaware Olds, Inc. v. Dixon*.[56]

In contrast to the case at hand, the challenging party in the *Deangelis* case requested a curative instruction immediately following summations.[57]  The trial court denied the requested instruction.  On appeal, the Delaware Supreme Court held that

> [i]n the civil arena . . . [a]ny effort to mislead the jury or appeal to its bias or prejudice is inappropriate and, *where objection is made*, the trial court is obliged to act firmly with curative instructions.[58]

Likewise, in the *Dixon* decision, the challenging party lodged a timely objection to a plaintiff's golden rule violation and requested a curative instruction.[59]  As in the *Deangelis* matter, the trial judge declined the request for an instruction.[60]  Neither case stands for the proposition that the Court should have disregarded AmGuard's decision to not object and intervened *sua sponte*.  AmGuard cites no civil authority supporting a new trial on this basis.[61]

---

[55] 628 A.2d 77 (Del. 1993).

[56] 367 A.2d 178 (Del. 1976).

[57] *Deangelis*, 628 A.2d at 79.

[58] *Id.* at 80 (emphasis added).

[59] *Dixon*, 367 A.2d at 179.

[60] *Id.*; *Deangelis*, 628 A.2d at 79.

[61] Although AmGuard did not cite the *Sears, Roebuck & Co. v. Midcap*, 893 A.2d 542, 551 (Del. 2006) decision, the Court has considered it.  With regard to a conscience of the community type argument, the Delaware Supreme Court observed in *dicta* that a trial judge in a civil case should intervene *sua sponte* in the retrial, if plaintiff's counsel repeated similar arguments.  When providing this observation, the Court cited a criminal prosecutorial misconduct case for that premise.  *See Brokenbrough*, 522 A.2d at 863 (where the Supreme Court observed that the case "[o]nce again, [called upon us] to consider a criminal appeal in which it is alleged that the prosecutor's improper and prejudicial statements to a jury denied the defendant his right to a fair and impartial trial").  The Supreme Court limited its direction in the *Sears* case to the upcoming retrial at issue. *Sears, Roebuck & Co.*, 893 A.2d at 551.

**3. Given the evidence at trial, the jury's $500,000 punitive damages award shocks the conscience of the Court; it was likely the product of passion or prejudice.**

For the reasons discussed herein, the size of the jury's punitive damages award disregarded the great weight of the evidence to such a degree that it shocks the conscience of the Court. As a result, a new trial is necessary. Given that finding, the Court must determine what issues should be retried. To do so, the Court must determine the likely reason for the excessive verdict. Here, the Estate's closing argument, in the aggregate, likely inflamed the jury to the extent that its verdict was a result of passion or prejudice. Because it was so inflammatory, the new trial in this case must include the issues of liability and damages. It follows that remittitur is inappropriate.

**a. Based upon the trial evidence, the award was grossly excessive.**

AmGuard seeks a new trial or remittitur because of the size of the award. It urges the Court to focus its inquiry on the ratio approach applied in the *Delucia v. Great Stuff, Inc* decision.[62] There, the Superior Court focused on the proportion between compensatory and punitive damages.[63] In granting remittitur, it relied significantly upon the United States Supreme Court's reasoning in the *State Farm Auto. Ins. Co. v. Campbell*[64] decision. In the *Delucia* decision, the Superior Court observed that punitive damages should be generally limited to "double, treble, or quadruple damages to deter and punish."[65] There, the Court upheld a three to one ratio and expressed skepticism that a ratio of four to one would be constitutional.[66] Nevertheless, no Delaware decision cited by the parties or known to the Court,

---

[62] 2015 WL 5157127, at *4 (Del. Super. Apr. 10, 2015).
[63] *Id.*
[64] 538 U.S. 408 (2003).
[65] *Delucia*, 2015 WL 5157127, at *4 (citing *Campbell*, 538 U.S. at 425).
[66] *Id.*

17

including the *Delucia* decision, have identified a fixed standard for what proportion is excessive.[67]

Rather, more Delaware Courts have used the guideposts delineated in *BMW of North America, Inc. v. Gore*[68] as the framework to evaluate a punitive damage award, post-trial.[69]  In *Gore*, the United States Supreme Court identified three such guideposts.  They included:

> (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases.[70]

When applying these guide posts to this trial's evidence, the jury's $500,000 punitive damages award was excessive to the point that it shocks the Court's conscience and sense of justice.

The Court begins by examining the first guidepost.  In *Gore*, the Supreme Court wrote that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct."[71]  In evaluating the defendant's conduct, it held that a reviewing court may consider whether:

---

[67] *See Barba v. Boston Scientific Corp.*, 2015 WL 6336151, at *13–14 (Del. Super. Oct. 9, 2015) (using the jury's initial 3:1 ratio when reducing both the compensatory and punitive damages award, but not setting any fixed standard); *see also Jones v. Delaware Cmty. Corp. for Individual Dignity*, 2004 WL 2827924, at *2 (Del. Super. Apr. 29, 2004) (declining to adjust or overturn the jury's award for punitive damages because the "award of punitive damages [] slightly less than ten times the compensatory damages" did not shock the court's conscience"), *aff'd sub nom. Delaware Cmty. Corp. v. Jones*, 871 A.2d 1127 (Del. 2005).

[68] 517 U.S. 559 (1996).

[69] *See In re Servino v. Med. Ctr. of Delaware*, 1997 WL 528263, at *3 (Del. Super. Aug. 1, 1997) (summarizing the *Gore* guideposts used when "analyzing the propriety of a punitive damages award").  *See also Williams v. Manning*, 2009 WL 960670, at *12–14 (Del. Super. Mar. 13, 2009) (utilizing the *Gore* guideposts when granting remittitur).

[70] *Campbell*, 538 U.S. at 418 (summarizing *Gore*'s guideposts).

[71] *Gore*, 517 U.S. at 575.

the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.[72]

The degree of reprehensibility in this case weighs against such a large award. For the reasons addressed in the Court's summary judgment and trial decisions, a reasonable jury could have found that AmGuard's actions were taken in bad faith and that they rose to the level of *recklessly* disregarding Mr. Krieger's rights. Recklessness, however, is the least egregious state of mind justifying a potential punitive damages award.[73] Punitive damages are available in situations including intentional harm of another,[74] willful or wanton actions,[75] and those taken with actual malice.[76] The states of mind that justify punitive damages are no different in the insurance context than in any other.[77] At both the summary judgment stage and at the prayer conference, the Estate conceded that AmGuard's actions were not taken with malice or intent to cause harm.[78] Reckless disregard of Mr. Krieger's rights

---

[72] *Campbell*, 538 U.S. at 419.

[73] *Powell*, 2019 WL 4509165, at *3.

[74] *Jardel Co., Inc. v. Hughes*, 523 A.2d 518, 529 (Del. 1987) (summarizing punitive damages history).

[75] *Id.* at 530 (explaining "willfulness and wantonness involve an awareness, either actual or constructive, of one's conduct and a realization of its probable consequences," but that the Supreme Court preferred the term "reckless indifference" to the term wanton because of its extinct statutory roots).

[76] *Id.* at 529 (citing *Gannett Co., Inc. v. Re*, 496 A.2d 553, 559 (Del. 1985)).

[77] *Tackett v. State Farm Fire & Cas. Ins. Co.*, 653 A.2d 254, 264 (Del. 1995); *see also Jardel*, 523 A.2d at 529 ("explaining that "[t]he penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is 'outrageous,' because of 'evil motive' or '*reckless indifference* to the rights of others'") (emphasis added).

[78] *See* Trial Transcript, Vol. D, at D130:1–4 (providing, by the Estate, that "[w]e have never said a word to suggest that they acted maliciously either on summary judgment or at trial. It's never been a contention of ours. It isn't a contention of ours now.").

was the sole basis for the jury's instruction regarding punitive damages.[79] Recklessness is the least reprehensible state of mind on the spectrum.

Furthermore, with regard to the *Gore* factors that bear on reprehensibility, the harm in this case included economic damage caused by a delay in payment. The trial record contained no evidence that AmGuard threatened Mr. Krieger's health or safety. Nor does the trial record contain evidence that AmGuard targeted him because of his financial vulnerability. Moreover, although the Estate presented evidence of a prior incident of similar conduct, that evidence included only one prior incident of potential bad faith. Finally, the Estate did not pursue, nor did the evidence demonstrate, any malice, trickery, or deceit on AmGuard's part. Considering these factors in the context of an unjustified delay that lasted less than three months, together with the fact that AmGuard's ultimately payed Mr. Krieger the benefits due, AmGuard's reprehensibility did not justify a $500,000 punitive damages award.

The second guidepost requires the Court to examine the disparity between the punitive damages award and the compensatory damages award. Courts should review the two to determine whether there is a reasonable relationship between them.[80] When doing so, courts have consistently rejected the notion that a simple mathematical formula sets a constitutionally permissible line.[81] In its *Campbell*

---

[79] *See id.* at D130:12–14 (explaining, by the plaintiff, "[w]e've only alleged reckless indifference. It's the only issue on the table. It's all we ever argued, all we're going to argue."). *See also* Trial Transcript, Vol. E, at E112:19–113:8 (instructing the jury that "[t]he Estate may be entitled to the recovery of punitive damages in a bad faith action if the insurer's breach is particularly egregious. If you find that AmGuard's breach of the insurance policy was done with reckless indifference to Mr. Krieger, you may impose punitive damages. Reckless Conduct Defined. Reckless conduct reflects a knowing disregard of a substantial and unjustifiable risk. It amounts to an "I don't care" attitude. Recklessness occurs when a person, with no intent to cause harm, performs an act so unreasonable that he or she knows, or should know, that harm will probably result.").
[80] *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 460 (1993).
[81] *Gore*, 517 U.S. at 582.

20

decision, the Supreme Court recognized that the amount of the compensatory damages award permits ratio fluctuation.[82] Namely, where compensatory damages are higher, the ratio may be lower, and vice versa. This permits leeway, based upon the circumstances of each case, to address the reasonableness of the relationship.[83] Such leeway, however, does not eliminate the need to consider this guidepost.

AmGuard understandably attacks the verdict because of its disparity. Here, the interest due as a result of AmGuard's unreasonable delay totaled just $28.22. The jury awarded punitive damages in the amount of $500,000. That results in a ratio of over 17,000:1. Courts have considered far less to be excessive. Even when considering the potential harm to Mr. Krieger, such as if he never received the $7,300 delayed payment, the ratio from potential harm to punitive damages is grossly disproportionate. This guidepost also weighs strongly against such a large award.

Finally, the Court must consider the third guidepost: the disparity between the punitive damages award and civil or criminal penalties authorized for similar misconduct. With this guidepost, courts "accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue."[84]

The parties take different approaches. AmGuard seeks to analogize the penalty provided in 19 *Del. C.* § 1103(b). That provision sets the statutory penalty for like transgressions. There, when an employer does not pay an employee's wages that are due, it is liable to the employee for "liquidated damages in the amount of 10 percent of the unpaid wages for each day . . . upon which such failure continues after the day upon which payment is required or in an amount equal to the unpaid wages,

---

[82] *Campbell*, 538 U.S. at 425

[83] *See id.* (discussing ratios of awards and stating "[t]he precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff").

[84] *Gore*, 517 U.S. at 583 (quoting *Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301 (1989) (O'Connor, J., concurring, in part, and dissenting, in part)).

whichever is smaller."[85]  Using this guidance, AmGuard suggests that an appropriate penalty should not exceed $7,300.[86]

The Estate references a criminal statute, 11 *Del. C.* § 840.  That statute defines criminal conduct to include that in which a person alters retail sales receipts or UPC labels with an intent to cheat or defraud.[87]  If more than fifteen illegitimate receipts or sales labels are involved, the crime becomes a Class F Felony.[88]  If the defendant is an organization, it would be subject to an enhanced financial penalty of $500,000 for that felony.  In this regard, the Estate suggests that AmGuard's conduct—a reckless disregard when investigating and making payment—should be compared to a felony that requires proof of an intentional *mens rea.*

AmGuard's suggested benchmark is the more apt.  Namely, the civil penalty relied upon by AmGuard addresses similar conduct.  To compare a reckless failure to pay workers' compensation benefits to an intentionally fraudulent felony is inappropriate.  As a result, the third guidepost also weighs strongly against such a large award.

As a final matter, the Estate emphasizes AmGuard's financial strength. Evidence at trial demonstrated that AmGuard received an A.M. Best financial strength rating of A plus or superior.[89]  The A.M. Best rating also categorized AmGuard as a company financially sized between $500 million to $750 million.[90] The wealth of the defendant is an important additional factor for the trier of fact to consider.[91]  In this regard, the Estate correctly emphasizes that punitive damages are

---

[85] 19 *Del. C.* § 1103(b).

[86] Def. AmGuard Mot. for Remittitur Reply Br., at 9 ¶ 17.

[87] 11 *Del. C.* § 840A(a).

[88] *Id.* at § 840A(b).

[89] Pl. Resp. to Def. AmGuard's Mot. for Remittitur, Ex. B, at 18:17–19:4.

[90] *Id.* at 19:5–16.

[91] *See Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 22 (1991) (including a defendant's wealth as a factor to consider regarding the amount of punitive damages).

intended to punish a bad actor and deter others like it from engaging in similar misconduct.[92] In the insurance context, achieving the goal of deterrence may require a larger punitive damages award where wealthy insurance companies are involved.[93] Too small of a deterrent may remove a fear of meaningful repercussions. As a result, a finding of reckless conduct, taken with an "I don't care attitude" by a company of AmGuard's size may warrant a significantly upward departure from a single digit ratio.

Greater latitude in such cases, however, cannot justify a punitive damages award that is so disproportionate given this evidentiary record. After considering *Gore*'s guideposts and the evidence at trial, the jury's award was against the great weight of the evidence and shocks the Court's conscience. Accordingly, a new trial is necessary. To determine the scope of the retrial, the Court must next address the likely reason for the jury's excessive award.

### b. The Estate's closing argument likely inflamed the jury and caused it to return a verdict based upon passion or prejudice.

The Estate's closing argument raises two separate issues. As previously discussed, AmGuard's failure to object to it at trial bars the direct relief it seeks. Rather, a new trial is necessary because of the grossly excessive verdict that was against the great weight of the evidence. AmGuard's arguments regarding the Estate's inflammatory closing argument remain relevant, however, for another aspect of the Court's analysis: the scope of the new trial.

With regard to the Estate's closing argument, punitive damages were at issue. In a case involving punitive damages, greater latitude in argument is appropriate. Such argument may include a request to "send a message," and to punish a defendant

---

[92] *Jardel*, 523 A.2d at 527.

[93] *Haslip*, 499 U.S. at 22.

significantly enough to deter future conduct.   There also may be more of an appeal to "the conscience of the community" than would be appropriate, for instance, in a negligence case.   The Court is mindful of that reality.

There was no evidence presented at trial, however, that justified shouting during summation that AmGuard's employees were "filth" or that AmGuard was seeking to treat the jurors as though they were "bumbling fools."[94]   Nor did AmGuard's financial condition warrant the Estate's argument that "[AmGuard] lights their cigars with [the amount of] money [at issue here]."[95]

Furthermore, the Estate's counsel sought to invoke the conscience of the community in an inappropriate manner by telling the jury that he was not going to personally thank them during his closing.  Rather, he told them he would wait until he learned of their verdict to do so.[96]  He also urged them to have the moral courage to return a large verdict and be "a great jury for the people you love, for your neighbors, for your friends, and for your community."[97]  He further argued to the jury that they were surrounded by powerful, rich corporations, and that they would have more power when rendering their verdict than they would ever have again in their lives.  Finally, he implored the jury, while crying, to return a large award and to "have faith and faith shall be given."[98]

While AmGuard's choice to not object gives it no direct remedy for these closing remarks in a civil case, in totality, they likely inflamed the jury.  There was no evidence presented at trial to justify so large of an award.  After searching the trial record, the Court finds that the Estate's arguments were not based upon the

---

[94] Trial Transcript, Vol. E, at E16:15.
[95] *Id.* at E46:23–E47:1.
[96] *Id.* at E4:21–6:3.
[97] *Id.* at E46:20–22.
[98] *Id.* at E103:11.

evidence and inflamed the jury.   Accordingly, after considering these arguments in their aggregate, the jury likely based its verdict upon passion or prejudice.

### c. Because the jury likely based its verdict upon passion or prejudice, a retrial of the issues of liability and damages is necessary.

Rule 59(a) permits the Court to grant a retrial "as to all or any of . . . the issues in an action."  AmGuard argues for remittitur, which by definition involves, as an alternative, a retrial regarding the issue of damages only.  At least one Delaware Superior Court decision held that verdicts induced by passion or prejudice warrant remittitur.[99]  The better view, however, is one that conditions remittitur upon the Court's confidence that the jury fairly considered the issue of liability. [100]  *Wright & Miller*'s analysis of Federal Rule of Civil Procedure 59 provides that:

> [o]ne limitation on the use of remittitur remains.  It is not proper to use it if the verdict was the result of passion and prejudice, since prejudice may have infected the decision of the jury on liability, as well as on damages.  In those instances a complete new trial is required.[101]

Multiple federal authorities persuasively track this analysis.  They distinguish the reasons for granting a new trial and recognize that if the reason was likely the jury's passion or prejudice, a court must assume that such motivation infected the jury's

---

[99] *See Barba*, 2015 WL 6336151, at *9 (observing incorrectly that remittitur is required *only* when the award of damages is so excessive that it must have been based on passion, prejudice or misconduct, rather than an objective consideration of the evidence presented at trial).

[100] *See Burns v. Delaware Coca-Cola Bottling Co.*, 224 A.2d 255, 259 (Del. Super. Nov. 10, 1966) (explaining an entirely new trial was not warranted as to liability and damages because "[t]he issues in the case were distinct and the jury was instructed clearly to consider damages only after it was determined that the plaintiff was entitled to recover. The whole thrust of the defendant's case was on the liability question and there is no reason to believe that the defendant did not receive a fair hearing as to that question. Rule 59, which permits partial new trials, was intended to prevent the retrial of any issue already properly decided and to limit any new trial only to those issues which were incorrectly decided").

[101] 11 Charles Alan Wright et al., *Federal Practice and Procedure* § 2815.

finding regarding liability.[102]  This principle is consistent with Delaware case law's "inexorably intertwined" standard for determining which issues should be retried. Namely, Delaware law requires courts to consider whether previously tried claims are so inexorably intertwined that all—and not part—of the claims should be retried.[103]

Because the jury's verdict likely resulted from passion or prejudice caused by the Estate's summation, it likely impacted the jury's liability finding.   As a result, the Court cannot make the required finding that the issues of liability and damages were distinctly considered.   Under these circumstances, they were inexorably intertwined and a new trial limited to damages only would be improper.

## IV.   CONCLUSION

Because AmGuard failed to renew its motion for judgment as a matter of law at the close of all the evidence, it is precluded under Superior Court Civil Rule 50(b) from renewing that motion now.  As a result, its Motion for Judgment as a Matter of Law must be **DENIED**.  However, because the punitive damages award shocks the Court's conscience, AmGuard's Motion for a New Trial must be **GRANTED**. Furthermore, because the Estate's closing argument likely prejudiced the jury's

---

[102] *See Thorne v. Welk Inv., Inc.*, 197 F.3d 1205, 1210 (8th Cir. 1999) (finding that "[w]hen a punitive damage award is the result of passion and prejudice, a new trial is usually required and remittitur is an inappropriate remedy . . . Remittitur is often inadequate in this situation because the passion and prejudice may have affected the jury's decision on the question of liability, as well as damages"); *Malandris v. Merrill Lynch, Pierce, Feener & Smith Inc.*, 703 F.2d 1152, 1168 (10th Cir. 1981) (explaining that where "the court determines that the jury's verdict was the result of passion or prejudice,  . . . the court must unconditionally order a new trial and cannot give the plaintiff the option to accept a lesser amount").

[103] *See Amisial v. Scott*, 2018 WL 3409915, at *2 (Del. Super. July 12, 2018) (explaining that Delaware case law repeatedly references an "inexorably intertwined" standard for determining whether part or all of the previously tried issues should be retried); *Parisi v. State Farm Mut. Auto. Ins. Co.*, 2010 WL 4139289, at *2 (Del. Super. Oct. 18, 2010) (requiring both the derivative and primary claims of a case to be retried); *Smith v. Lawson*, 2006 WL 258310, at *8 (Del. Super. Jan. 23, 2006) (granting a new trial only as to damages where there was no showing that liability was "inexorably intertwined" with damages).

liability determination in addition to its damages award, remittitur is inappropriate. The scope of the new trial will include liability and damages.

**IT IS SO ORDERED.**

/s/Jeffrey J Clark<br>
Judge

JJC:jb
*Via File & Serve Xpress*